ORVILLE L. LESHER AND CAROL LESHER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9790–77.    Filed November 26, 1979.

*George Wright,* for the petitioners.
*Robert L. Archambault,* for the respondent.

Scott, *Judge:* Respondent determined deficiencies in petitioners' Federal income taxes for the calendar years 1974 and 1975 in the amounts of $2,868.16 and $1,629.35, respectively.

The issues for decision are: (1) Whether payments received by petitioners from a contractor for removal of gravel from certain tracts of petitioners' farm constitute ordinary income subject to depletion under sections 611 and 613, I.R.C. 1954,[1] or long-term capital gains under section 1221; and (2) whether a structure placed by petitioners on their farm qualifies as a "storage facility" within the meaning of section 48(a)(1)(B)(iii) or a "single purpose agricultural structure" within the meaning of section 48(a)(1)(D) so as to be eligible for investment credit as "section 38 property."

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Orville L. Lesher and Carol Lesher, husband and wife, who resided in Woolstock, Iowa, at the time of filing their petition in this case, filed joint Federal income tax returns for the calendar years 1974 and 1975 with the Internal Revenue Service Center, Kansas City, Mo.

From 1960 to 1967, petitioners leased 320 acres of land in Wright County, Iowa, from George and Lillian Wright and farmed it. On November 2, 1967, petitioners purchased from Mr. and Mrs. Wright, for $90,000, the 320 acres pursuant to a sales contract. During the subsequent years, including the years in issue, petitioners have continued to farm this land and have raised cattle and pigs. Petitioners made a number of improvements to the property, including a quonset-type machine shed, corn bins, hog-raising facilities, and the facility with respect to which they claimed the investment credit here in issue.

Upon the purchase of their farm, petitioners were aware of certain gravel deposits located beneath the farm's topsoil. Before the sale to petitioners, Mr. and Mrs. Wright had

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue.

extracted and sold gravel from a certain portion of the farm. Mr. and Mrs. Wright supplied petitioners an engineering report which indicated the location of the remaining gravel deposits. The sales contract covering petitioners' purchase of the land contained a restrictive provision with regard to petitioners' rights to sell gravel from the farm.[2] While petitioners had several opportunities to sell the gravel to solicitous buyers, petitioners did not contract for any sales until 1974.

During the winter of 1973, Mr. Russell Johnson, materials director for Maudlin Construction Co. (Maudlin), Webster City, Iowa, discovered that the Iowa State Highway Commission planned to build a road between Woolstock and Eagle Grove, Wright County, Iowa. Thereafter, Mr. Johnson contacted Mr. Lesher to determine whether petitioners would consider selling gravel from their deposits to Maudlin. On January 14, 1974, Maudlin conducted tests to monitor the depths and types of gravel located on petitioners' property. These gradation tests indicated that petitioners' gravel would meet the needs and specifications of Wright County and the State of Iowa for the planned road. Soon, thereafter, Maudlin orally informed Mr. Lesher of the test results although Mr. Lesher did not receive a copy of the test report.

On May 18, 1974, Messrs. Lesher and Johnson executed an "Agreement" entitling Maudlin to purchase gravel from petitioners if Maudlin proved successful in obtaining either a contract to provide approximately 51,000 tons of gravel for road building and paving projects S–2080 and LT–2081 or a contract with Wright County, Iowa, "to supply its gravel needs" in the approximate sum of 25,000 tons per year for 1975 and 1976. This contract provided in part:

THIS AGREEMENT entered into this 18th day of May 1974 by and between Orville Lesher * * * hereinafter referred to as first party, and Maudlin Construction Company * * * , hereinafter referred to as second party, witnesses:

---

[2]This contract provided in this respect:

"7. There are certain gravel deposits upon said premises. Buyers may open additional pits adjacent to the present one and sell gravel therefrom in bulk quantities provided they do not cut up the premises so as to impede the farming thereon and the security of sellers, and provided also that they collect not less than 20 cents per cubic yard therefore [sic] and apply the proceeds of all such sales upon their reserve account herein mentioned."

\*     \*     \*     \*     \*     \*     \*

WHEREAS second party desires to bid upon the surfacing of a certain road, being designated as S2080 and LT2081, between Eagle Grove and Woolstock during this year, which project will require approximately 51,000 tons of gravel, and, if second party is successful in obtaining the contract therefor, it desires to produce said gravel from said premises, and

WHEREAS second party has contracted with, or expects to contract with Wright County, Iowa to supply its gravel needs in the adjoining territory, which needs are expected to approximate about 25,000 tons per year, and it desires to produce said gravel from said premises, and

WHEREAS second party has made certain explorations as to the quantity and quality of the gravel on said premises and both parties believe that both quantity and quality of the gravel deposits are such that said gravel can be produced in the quantities above mentioned within the restrictions imposed by the above mentioned sales contract and without substantial interference with the primary farming operations or impairment of the security of said contract sellers,

Now THEREFORE, in consideration of their mutual promises and other good and valuable considerations the parties do hereby agree as follows:

1. Provided the gravel actually removed proves to be of suitable quantity and quality for said projects, first party will sell to second party the gravel in place upon said premises sufficient to fulfill the needs of said projects S2080 and LT2081 in the event that second party is the successful bidder on said projects, and regardless of whether second party is the successful bidder on said projects, if second party has the contract to supply the needs of Wright County for the years 1975 and 1976, first party will sell to second party the gravel in place upon said premises sufficient to fulfill the needs of Wright County during those years. The gravel is to be removed from areas adjacent to the present pits so as not to protrude irregularly into cultivated fields and so as not to impede the farming operations or the security of the contract sellers. First party will lay off an area containing approximately three to five acres as will satisfy the needs of second party, and as may be agreed upon by the parties, along the length of the present pit, and may fence the same so as to separate the farming from the gravel operation. All gravel removed shall be weighed over scales to be supervised by the Iowa State Highway Commission or Wright County, Iowa, as the case may be, and the quantities removed shall be determined by said bodies, and first part [sic] together with his contract sellers shall at all reasonable times have access to the records of the gravel removed. Second party may produce gravel, weigh it as above provided, and stockpile it in the bottom of the old pit area without charge for the stockpile site. Second party, or the surfacing contractor on said projects S2080 and LT2081, may install an asphalt plant on the old pit site during the surfacing of said projects upon payment to first party of the sum of $50.00 per acre. It is expected that the plant site will require approximately four acres. Such party shall remove said plant reasonably soon after the completion of the surfacing project, and shall leave the plant site in a clean and neat condition to the satisfaction of first party. The strippings shall be removed for safekeeping to an area in the old pit which may be agreed upon by the parties and, when the gravel is removed, all large stones or rock shall be removed or buried below

plow depth, and the strippings shall be replaced if feasible and, in any event, the strippings shall be levelled off so that the ground can be seeded. Second party and the Iowa State Highway Commission and Wright County shall have access to the area directly over the present access entries, and not thru the farm yards, for transportation of any gravel removed either directly or after stockpiling. Such parties shall also have a reasonable time in which to remove any stockpiled gravel after the termination of this agreement.

2. First party shall have the right at all reasonable times to remove as much of the produced gravel as he may deem necessary for surfacing his own lanes and farm yards.

$$* \quad * \quad * \quad * \quad * \quad * \quad *$$

4. It is recognized that much of the gravel to be removed may be below the water level of the nearby river and that there may be seepage from the river into the pit. However, all gravel shall be removed to the fullest extent feasible and, if this is not feasible, the removal operations in such areas may be suspended at the option of first party. * * *

5. Second party shall pay, or cause to be paid, to first party and the contract sellers jointly for all gravel removed at the rate of 25¢ per ton, as measured and weighed as above provided. Payment for gravel used on projects S2080 and LT2081 shall be made by second party forthwith upon receipt by second party of payments made to second party by the Iowa State Highway Commission. As to payment for the gravel produced for Wright County, Iowa, it is recognized that for income tax purposes, or otherwise, first party may wish to receive such payments at other times than those when payments are made to second party from Wright County. To facilitate this, at first party's option, second party shall leave on deposit with Wright County, Iowa 25¢ for each ton of gravel for which it is entitled to payment from Wright County and the liability of second party to first party shall be reduced and cancelled accordingly to the amount of such deposit, such deposit to be subject to withdrawal by first party from Wright County at such reasonable times and in such reasonable amounts as first party may desire.

6. First party reserved a lien upon all gravel produced as security for all sums due him. Upon the withdrawal of any gravel from the premises, said lien shall be automatically transferred to the proceeds of sale of the gravel so withdrawn.

On May 24, 1974, the Iowa State Highway Commission advertised and invited bids for specified quantities of work and materials for the Woolstock-Eagle Grove Road, designated project S–2080. Thereafter, on May 28, 1974, Wright County, Iowa, invited bids for project LT–2081. The Iowa State Highway Commission awarded to Everds Bros., Inc., the contracts for projects S–2080 and LT–2081 on June 18, 1974, and June 10, 1974, respectively. Those contracts required a total of 54,595 tons of gravel and asphalt treated base. On or about June 24, 1974, Maudlin, as subcontractor, entered into a contract to furnish

Everds Bros., Inc., the required 54,595 tons of gravel from the Lesher pit.

Thereafter, Messrs. Lesher and Johnson walked through petitioners' property and negotiated the area from which Maudlin would extract the gravel. They selected a site and approximated the amount of surface and subsurface space required to produce the needed gravel.

Pursuant to the "Agreement" between Mr. Lesher and Maudlin, the latter extracted 53,170.63 tons of gravel for projects S–2080 and LT–2081 from the Lesher pit during the period of September 13 to October 10, 1974. As required by the May 18, 1974, "Agreement," Wright County, Iowa, weighed this tonnage and certified the weight as correct and the quality as meeting their specifications. Because Maudlin had agreed to purchase the gravel from petitioners at the rate of 25 cents per ton, it paid petitioners the total sum of $13,292.66 on November 13, 1974. Moreover, pursuant to the "Agreement," Maudlin produced 20,510.9 tons of gravel to fulfill the Wright County, Iowa, needs for 1975. That gravel was extracted from the Lesher pit during the period of October 8, 1974, to October 14, 1974. Maudlin paid petitioners, based on 25 cents per ton for the gravel as the "Agreement" mandated, $5,127.73 on October 25, 1974.

In the early part of 1975, Mr. Johnson approached Mr. Lesher to determine whether Mr. Lesher would be willing to sell more gravel to Maudlin for a newly anticipated project. At that time Mr. Lesher orally agreed to the sale, which agreement was later reduced to writing on November 5, 1975. This agreement provided in part:

THIS AGREEMENT entered into this 5 day of Nov. 1975 by and between Orville Lesher * * * , hereinafter referred to as first party, and Maudlin Construction Company * * * , hereinafter referred to as second party, witnesses:

\* \* \* \* \* \* \*

WHEREAS second party holds a contract to produce approximately 22,000 tons of gravel for resurfacing certain roads in Wright County, Iowa being designated as L–852, SN–444, SN–825, and SN–852, and second party has made certain explorations as to the quantity and quality of the gravel on said premises, and both parties believe that both quantity and quality of the gravel deposits are such that said gravel can be produced in the quantities above mentioned within the restrictions imposed by the above mentioned sales

contract and without substantial interference with the primary farming operations, or impairment of the security of said contract selllers,

Now THEREFORE, in consideration of their mutual promises and other good and valuable considerations, the parties do hereby agree as follows:

1. First party will sell to second party the gravel in place upon said premises sufficient to fulfill the needs of said projects, provided it proves to be of suitable quantity and quality for said projects. The gravel is to be removed from areas adjacent to the present pits so as not to protrude irregularly into cultivated fields and so as not to impede the farming operations or the security of the contract sellers. First party will designate an area as may be agreed upon by the parties sufficient to produce the quantity of gravel needed for said projects, and may fence the same so as to separate the farming from the gravel operation. All gravel removed shall be weighed over scales to be supervised by the Iowa State Highway Commission or Wright County, Iowa, as the case may be, and the quantities removed shall be determined by said bodies, and first party together with his contract sellers shall at all reasonable times have access to the records of the gravel removed. Second party may produce gravel, weigh it as above provided, and stockpile it in the bottom of the old pit area without charge for the stockpile site. Second party, or the surfacing contractor on said projects may install an asphalt plant on the old pit site during the surfacing of said projects upon payment to first party of $50.00 per acre for a site which is expected to require approximately four acres, and shall remove said plant reasonably soon after the completion of the surfacing project, and leave the plant site in a clean and neat condition to the satisfaction of the first party. The strippings shall be removed for safekeeping to an area in the old pit which may be agreed upon by the parties and, when the gravel is removed, all large stones or rock shall be removed or buried below plow depth, and the strippings shall be replaced if feasible and, in any event, the strippings shall be levelled off so that the ground can be seeded. Second party and the Iowa State Highway Commission and Wright County shall have access to the area directly over the present access areas and entries, and not thru the farm yards, for transportation of any gravel so removed and processed.

2. It is recognized that much of the gravel to be removed may be below the water level of the nearby river and that there may be seepage from the river into the pit. However, all gravel shall be removed to the fullest extent feasible and, if this is not feasible, the removal operations in such areas may be suspended at the option of the first party. * * *

3. Second party shall pay, or cause to be paid, to first party and the contract sellers jointly for all gravel removed at the rate of 25¢ per ton, as measured and weighed as above provided forthwith upon receipt by second party of payments made to second party from the Iowa State Highway Commission.

4. First party reserves a lien upon all gravel produced as security for all sums due him. Upon the withdrawal of any gravel from the premises, said lien shall be automatically transferred to the proceeds of sale of the gravel so withdrawn.

Soon after Messrs. Lesher's and Johnson's verbal understanding, the anticipated project was awarded to Maudlin, as subcontractor. Rohlin Construction Co., Inc. (Rohlin), had received a

contract from the State of Iowa and Wright County, Iowa, to resurface several roads. These projects were designated SN–852, SN–444, SN–825, and L–852. On April 21, 1975, Maudlin, as subcontractor, entered into a written contract with Rohlin to furnish from petitioners' pit approximately 31,730 tons to cover the above-enumerated projects. Again on July 10, 1975, the State of Iowa and Wright County, Iowa, awarded Rohlin a new project to resurface an additional 6.818 miles of road; this project was designated SN–1256. Subsequently, Maudlin verbally agreed with Rohlin to provide the additional 9,866 tons of gravel necessary for that project.

During the period of April 21, 1975, to May 7, 1975, Maudlin extracted 29,841.41 tons of gravel from petitioners' open gravel pit. That production provided the gravel for Maudlin's contract pertaining to projects SN–852, SN–444, SN–825, L–852, and SN–1256. Based on a rate of 25 cents per ton, Maudlin paid petitioners $4,250 on August 13, 1975, and $3,210.35 on November 12, 1975. As with the 1974 projects, the gravel produced was weighed on scales supervised by either the Iowa State Highway Commission or Wright County. Therefore, for the 1974 and 1975 projects, Maudlin paid petitioners on the basis of gravel tonnage actually weighed by one of those authorities.

The final sales transaction at issue concerns gravel extracted from the Lesher pit on May 7, 1975. At that time, Maudlin produced 1,800 tons of gravel for sale to a third party, Guiese Construction, of Eagle Grove Road, at the rate of 25 cents per ton. As required by a verbal agreement between Messrs. Lesher and Johnson, Maudlin paid petitioners $450 on August 11, 1975, for that gravel.

Maudlin made several additional extractions of gravel in 1975 and 1976, but these are not in dispute for 1974 and 1975 income tax purposes. From December 3, 1975, to December 12, 1975, Maudlin produced 20,037.3 tons of gravel from the Lesher pit, and between November 9, 1976, and November 17, 1976, Maudlin removed 20,003.9 tons of gravel. The amounts of $5,009.33 and $5,000.99 were paid for these extractions on Januray 15, 1976, and on January 3, 1977, respectively. Those extractions were used to fulfill the 1976 needs of Wright County in accordance with the May 18, 1974, "Agreement." Again, on December 12, 1975, Maudlin produced 1,826.2 tons of gravel from the Lesher pit to sell to a third party. Maudlin paid petitioners $456.55 on

January 15, 1976, for this latter extraction. In March 1978, petitioners and Maudlin executed another "Agreement," which is not involved in this case.

The 1974 through 1976 gravel extractions from the Lesher property resulted in water collecting in a deep pit and forming a pond. Petitioners used that pond for several years subsequent to 1976 as a water source to irrigate their farmland. The black topsoil which originally covered the pit was dumped into the area formerly used by Mr. and Mrs. Wright as their gravel pit. That movement of topsoil enabled petitioners to reclaim the land for use as pastures and as tracts to raise clover and grasses for hay.

During the summer of 1974, petitioners purchased and constructed a "Morton Building," which was designated by Morton Buildings as a "general purpose livestock barn." Since the facility's construction, petitioners have stored hay therein. During the winter months, at which time the cattle are unable to forage for themselves, petitioners feed that hay to their cattle.

The total cost of constructing the facility was $9,324.79, of which $7,923 constituted payment for the structural portions of the facility. The structural components include a roof, roof trusses, three exterior walls, siding, doors, and cement foundation for each 6-inch by 6-inch post supporting the facility. Petitioners paid $1,401.79 for the cement floor.

The structure is 81 feet in length and 53 feet in width (including a 3-foot overhang of the roof on the open south side). Doors are located on the east and west sides and are 10 feet 6 inches in height and 15 feet 5 inches in width. Facing the structure's south side, which is the only side completely open to the weather, the first 5 feet has a cement floor over which hangs the roof, and the height from the floor to the roof is 8 feet. The next 15 feet is separated from the first 5 feet by gates erected by petitioners after the initial construction of the building. Those gates can be swung open, and the 15 feet located immediately thereafter has a concrete floor covered by a roof, sloping up to a maximum height of 12 feet. The next 30 feet of the structure, which extends to the north side of the facility and is separated from the prior 20 feet by planking installed by Mr. Lesher to restrain cattle movement, has a dirt floor and is covered by a roof having a minimum height of 17 feet 6 inches. Thus, the roof

peaks near its north side and drops to its lowest point on the south side.

The facility is petitioners' sole structure for hay storage. Hay is stored in the facility from the north wall to the south side, there being no interior solid walls. When filled, the structure holds in excess of 5,000 bales of hay.

To protect the hay from debasement, the cattle are restrained from entering the structure past the gates until all hay previously stored in the 20-foot cement floored area has been consumed. Thereafter, the gates are opened, and the cattle are allowed to roam into the entire concrete floored area. The planking installed by petitioners subsequent to the structure's initial construction restrains the cattle from entering the 30-foot dirt floored portion. That 30- by 81-foot area is used solely for the storage of hay. To feed the cattle, on a regular basis Mr. Lesher rotates forward several bales previously stored in the latter area, placing them in the cement floored area for the cattle to eat. Thus, when hay is harvested and baled from the fields each season, it is moved into petitioners' structure and placed in the positions of bales previously eaten.

After Morton Buildings erected the facility, petitioners added the 20-foot concrete flooring on a slope away from the dirt area to further insure against quality deterioration of the hay. That construction directs all cattle excretions away from the hay storage area.

Petitioners purchased the facility for several reasons. The prior hay storage area, an old barn, proved to be a difficult space for moving the hay to the cattle. By contrast, the new facility allows for easy handling of the hay. A grain elevator, not itself attached to the structure, is located on one corner of the facility. Additionally, because the old barn, which is enclosed on four sides, created an unhealthy, humid atmosphere for the cattle, it was converted to a hog-raising operation. Since the new facility is open on the south side, it provides a healthier atmosphere for petitioners' 30 to 50 head of cattle.

On their income tax returns, petitioners claimed long-term capital gains from the sale of gravel, as follows:

|  | 1974 | 1975 |
|---|---|---|
| Gross sales price | $18,420.39 | $7,910.35 |
| Cost of gravel | 350.00 | 160.00 |
| Capital gain | 18,070.39 | 7,750.35 |

On their 1974 income tax return, petitioners claimed an investment credit of $1,353.91, of which $554.58 was relevant to their investment in the structural portion of the Morton facility.

Respondent in his notice of deficiency determined for each of the years 1974 and 1975 that petitioners "retained an economic interest in the sand and gravel on your farm and the income derived from extraction is ordinary income subject to depletion under sections 611 and 613 of the Internal Revenue Code."

Respondent, in his notice of deficiency, disallowed the investment credit claimed by petitioners with respect to the Morton facility.

## OPINION

This case concerns the frequently litigated question of the proper characterization of income realized by a property owner upon the removal and sale of gravel deposits. Specifically, the issue is whether such income should be treated as capital gain or ordinary income. To make this determination, we must decide whether petitioners sold by contract the gravel "in place," which resulted in their selling a portion of their realty, or whether petitioners retained an "economic interest" in the minerals as a result of merely leasing the rights of removal to their contractor.

The "economic interest" test, as formulated by the Supreme Court, provides that moneys received for minerals are ordinary income subject to sections 611 and 613 depletion if the "taxpayer has acquired, by investment, any interest in the oil in place, and secures, by any form of legal relationship, income derived from the extraction of the oil, to which he must look for a return of his capital." (*Palmer v. Bender*, 287 U.S. 551, 557 (1933).) See *Burnet v. Harmel*, 287 U.S. 103 (1932). Courts have continually applied the "economic interest" test to deposits other than oil. E.g., *Hartman Tobacco Co. v. United States*, 471 F.2d 1327 (2d Cir. 1973) (sand and gravel); *Dingman v. United States*, 429 F.2d 70 (8th Cir. 1970) (sand and gravel); *Laudenslager v. Commissioner*, 305 F.2d 686 (3d Cir. 1962), affg. a Memorandum Opinion of this Court (dirt fill); *Rhodes v. United States*, 464 F.2d 1307 (5th Cir.

1972) (brick clay deposits). The second element of the "economic interest" test has been consistently interpreted to mean that profits from the sale of minerals, including gravel, are taxable as ordinary income unless the seller proves that (1) he retained no economic interest in the minerals sold, and (2) he never solely depended upon the removal of the minerals for a return of his capital. *Commissioner v. Southwest Exploration Co.*, 350 U.S. 308, 314 (1956); *Helvering v. Elbe Oil Land Development Co.*, 303 U.S. 372 (1938).[3]

Petitioners purchased by a contract executed with Mr. and Mrs. Wright on November 2, 1967, those gravel deposits in question as a portion of the entire 320 acres of farmland conveyed. There is no dispute that petitioners acquired by investment their interest in the gravel. Petitioners and respondent disagree only with regard to the second portion of the "economic interest" test. Contrary to respondent's position, petitioners claim to have completely divested themselves of their economic interest by means of a capital sale. As a result, petitioners seek to treat the realized amounts as long-term capital gains.

To determine whether petitioners disposed of their entire economic interest in the gravel, we must first look to their May 18, 1974, "Agreement" with Maudlin. Petitioners assert that the "Agreement" is merely a "quote" and as such, constitutes only a phase of negotiations. Petitioners reason that if that "Agreement" was not a binding contract on May 18, 1974, then all subsequent oral agreements between Maudlin and petitioners would have become a part of their contract later finalized upon the parties' mutual assent. Petitioners rely upon this position because they contend that the oral agreements when incorporated into the written "Agreement" strongly indicate that the

---

[3]Respondent's regulations are similar to the Supreme Court rule. Sec. 1.611–1(b)(1), Income Tax Regs., states in pertinent part:

(b) *Economic interest.* \* \* \* An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the extraction of the mineral or severance of the timber, to which he must look for a return of his capital. \* \* \* A person who has no capital investment in the mineral deposit or standing timber does not possess an economic interest merely because through a contractual relation he possesses a mere economic or pecuniary advantage derived from production. For example, an agreement between the owner of an economic interest and another entitling the latter to purchase or process the product upon production or entitling the latter to compensation for extraction or cutting does not convey a depletable economic interest. \* \* \*

resulting contract is a sales contract. Under petitioners' interpretation, the contract presumably was not formed until after Messrs. Lesher and Johnson had selected a definite location from which to extract the gravel needed to fulfill the requirements of projects S–2080 and LT–2081 and the 1975 and 1976 Wright County needs. Petitioners argue that the sales contract as finally consummated provides for the definite sale of all gravel.

On the other hand, respondent argues that the May 18, 1974, "Agreement" became a full-fledged contract on that date. We agree with respondent. Petitioners and Maudlin mutually assented to the terms necessary to form a valid contract. The "Agreement" includes, even by Mr. Lesher's own admission, a close approximation of the quantities that were to be extracted pursuant to the "Agreement"—approximately 51,000 tons for projects S–2080 and LT–2081 and approximately 25,000 tons for the 1975 and 1976 Wright County needs. The "Agreement" also contains a provision that "for all gravel removed [payment will be made] at the rate of 25 cents per ton."

The parties further agreed that the enforceability of the "Agreement" would be predicated upon (1) Maudlin's obtaining the projects, (2) Mr. Lesher's "lay[ing] off an area containing approximately three to five acres as will satisfy the needs of second party [Maudlin]," and (3) providing that "the gravel actually removed proves to be of suitable quantity and quality for said projects."

Those three provisions are merely conditions, and the "Agreement" is a conditional contract. As was stated in 3A A. Corbin, Contracts, sec. 629A, p. 9 (1971):

It will be useful here to call attention to the fact that an agreement is not prevented from being a valid contract by the fact that both of the exchanged promises are expressly conditional on one and the same event.

The parties did not agree that the contract shall not be binding, and they did not specify that either of them retained the privilege to revoke the "Agreement." The operative acts of offer and acceptance took place before the conditioned event; once that specified event occurred, the contract was immediately enforceable without any further act by either party.

The Supreme Court of Iowa has expressed its position on contracts which contain conditions precedent. In *National Farmers Organization, Inc. v. Lias*, 271 N.W.2d 751, 754 (Iowa

1978), the court cited and relied upon 3A A. Corbin, Contracts, sec. 628 at p. 16 (1960):

Conditions precedent "are those facts and events, occurring subsequently to the making of a valid contract, that must exist or occur before there is a right to immediate performance, before there is a breach of contract duty, before the usual judicial remedies are available."

We hold that the May 18, 1974, "Agreement" was a valid and binding contract as of that date with performance thereunder deferred to a later time.

There remains the question of whether the contracts petitioners entered into were sales contracts or merely leases providing for royalty payments. Both the May 18, 1974, and the November 5, 1975, contracts provide that "First party [Mr. Lesher] will sell to second party the gravel in place upon said premises." Under both contracts, Mr. Lesher reserved a lien on the gravel produced as security for payments due to him. On their face, those provisions indicate that the parties might have intended a sales contract. But as numerous courts have pointed out:

While the presence of language of sale has always been considered relevant, it is well recognized in both lines of authority that the labels or words used by the parties in forming their contract are not controlling. In short, the substance of the contract's terms and provisions will prevail over its form. [*Vest v. Commissioner*, 481 F.2d 238, 243 (5th Cir. 1973).]

See *Rhodes v. United States*, 464 F.2d 1307, 1311 n. 4 (5th Cir. 1972); *Rutledge v. United States*, 428 F.2d 347, 352 (5th Cir. 1970). Thus, we must look past the mere phraseology of petitioners' contracts to the substance of the transactions.

Petitioners allege that in looking beyond the language of their contracts to determine the true transactional nature, this Court must consider several factors. Petitioners first point out that their sole occupation has always been farming, and that they have never been in the business of selling gravel. That fact is important in establishing that petitioners were selling neither their inventory nor property held "primarily for sale to customers in the ordinary course of his trade or business." From this fact, it follows that petitioners should not necessarily be precluded from capital gains treatment under section 1221. However, their occupation is not determinative of the issue here presented. Rather, as earlier stated, the critical factor is whether petitioners looked solely to the extraction of gravel for their return of capital. *Commissioner v. Southwest Exploration Co.*, 350

U.S. 308 (1956). In other words, "the taxpayer will retain an economic interest in the resources if the consideration he receives is tied to the production of the resource." *Hartman Tobacco Co. v. United States,* 471 F.2d 1327, 1328 (2d Cir. 1973); *Freund v. United States,* 367 F.2d 776 (7th Cir. 1966).

The terminology of petitioners' May 18, 1974, contract indicates that petitioners' receipts were tied to the extraction of the gravel from their pit. It states that:

5. Second party shall pay, or cause to be paid, to first party and the contract sellers jointly for all gravel removed at the rate of 25¢ per ton, as measured and weighed as above provided. Payment for gravel used on projects S2080 and LT2081 shall be made by second party forthwith upon receipt by second party of payments made to second party by the Iowa State Highway Commission. As to payment for the gravel produced for Wright County, Iowa, * * * second party shall leave on deposit with Wright County, Iowa 25¢ for each ton of gravel for which it is entitled to payment from Wright County and the liability of second party to first party shall be reduced and cancelled accordingly * * *

Likewise, the November 5, 1975, "Agreement" provides:

3. Second party shall pay, or cause to be paid, to first party and the contract sellers jointly for all gravel removed at the rate of 25¢ per ton, as measured and weighed as above provided forthwith upon receipt by second party of payments made to second party from the Iowa State Highway Commission.

The indication from Mr. Johnson's testimony is that no contrary arrangement was actually implemented. Petitioners did not testify to the contrary. On cross-examination by petitioners' attorney, Mr. Johnson stated that Iowa paid Maudlin for the gravel only after it had been turned into asphalt and weighed for its gravel content. Moreover, as required by the contracts, the gravel first had to meet the authority's specifications. After Maudlin received payment for the gravel, petitioners received 25 cents per ton.

The courts have denoted other elements to give weight to the conclusion that taxpayers relied upon the extraction of minerals for return of their capital. Several courts have looked to whether the contract provided for extraction by the grantee of all minerals from a specified area. E.g., *Rhodes v. United States,* 464 F.2d 1307 (5th Cir. 1972); *Collins v. Commissioner,* 56 T.C. 1074 (1971). In *Rhodes v. United States, supra* at 1309, the contract purported to—

"grant, bargain, sell, assign, convey, transfer and set over unto" Excelsior, as grantee, "in fee simple", all of the "merchantable brick clay" deposits

underlying a specifically designated and described one acre parcel of the Stay tract, the purchase price being $7500.00. * * * [464 F.2d at 1309.]

Since the grantee had acquired title to all the clay, the court held the transaction a sale.

Comparatively, in *Collins v. Commissioner, supra* at 1075, the contract stated:

1. The Sellers hereby agree to sell to the Buyer, and the Buyer agrees to buy from the Sellers, all earth and granular materials which the Buyer desires to excavate and remove from the locations hereinafter described at the price of Ten Cents ($0.10) per cubic yard removed, as measured and determined by the Indiana State Highway Commission Project Engineer for aforesaid construction. The amount of earth and granular materials to be so removed shall be Five Hundred Thousand (500,000) cubic yards more or less.

In *Collins*, we noted that the contract was not drawn artfully, but upon consideration of the entire contract, concluded that it provided that all dirt located in a particular area would be removed, and payment therefor would be unconditional. On this basis, we held that the transaction was a sale.

The Lesher-Maudlin contracts do not provide for the removal of all minerals from the Lesher pit. The May 18, 1974, "Agreement," permits Maudlin's removal of approximately 51,000 tons of gravel for projects S–2080 and LT–2081, plus about 50,000 tons to cover the 1975 and 1976 Wright County needs. Indeed, in part, the "Agreement" is a "requirements" contract subject to a third party's fluctuating needs without room for complaint by petitioners. The actual tonnage subsequently removed pursuant to that contract amounted to 2,000 tons more than anticipated on May 18, 1974. If, instead, Maudlin had extracted exactly 101,000 tons or substantially less, neither would it have breached the contract nor would it have entirely exhausted the gravel located in the Lesher pit since the pit actually yielded over 101,000 tons. This fact supports the view that Maudlin was under no obligation to extract the total gravel tonnage contained in the pit.

As respondent points out, the 1974 contract undercuts petitioners' argument in that this "Agreement" gives petitioners the right to use as much extracted gravel as they desire for resurfacing their own farm areas. Certainly, if Maudlin were obligated to remove and pay for all minerals, it would not have agreed to such a provision.

Both the 1974 and 1975 written contracts further indicate that

Maudlin was not bound to extract all gravel in place. First, petitioners retained an option to force Maudlin to persist in its removal operations unless water seepage made it unfeasible by petitioners' standards for continued excavation.[4] If the contracts had effectuated the sale of all gravel in place, and if payments were not dependent on the amount of gravel produced, Maudlin would have logically retained this option so that it could determine whether to extract further gravel or discontinue the extraction processes depending on the economic feasibility of the operation.

Maudlin also was not obliged to extract a specific, predetermined minimum number of tons. In *Rutledge v. United States,* 428 F.2d 347 (5th Cir. 1970), the court looked at the contract involved, its economic realities, and the lack of a minimum tonnage removal requirement. There the court held that the contract was a lease and all payments made thereunder were royalties. Like that case, here we find that Maudlin could remove approximately 101,000 tons of gravel from the Lesher pit pursuant to the May 18, 1974, "Agreement" and approximately 22,000 tons under the November 5, 1974, contract. Neither contract contains definite specifications for minimums nor a determination of maximum numbers of tons to be removed. The more gravel that Maudlin extracted, the more money to which petitioners became entitled. Therefore, as in several other cases, taxpayers had an ongoing stake in the extraction. *Pleasanton Gravel Co. v. Commissioner,* 64 T.C. 510 (1975); *Rabiner v. Bacon,* 373 F.2d 537 (8th Cir. 1967).

Petitioners further argue that they must have intended to dispose of their entire interest in the gravel deposits because the removal rendered the land worthless for farming. Petitioners rely upon *Dann v. Commissioner,* 30 T.C. 499 (1958), and several subsequent cases.[5] In *Dann,* taxpayers were dairy farmers. They agreed to sell the soil from various tracts to a contractor for use in constructing a railroad right-of-way and levee protection. At that time, the taxpayers indubitably knew that all usable soil

---

[4] "4. It is recognized that much of the gravel to be removed may be below the water level of the nearby river and that there may be seepage from the river into the pit. However, all gravel shall be removed to the fullest extent feasible and, if this is not feasible, the removal operations in such areas may be suspended at the option of first party. * * * "

[5] *Brown v. United States,* an unreported case (E.D. Ark. 1965, 17 AFTR 2d 66–064, 66–1 USTC par. 9153); *Johnson v. Commissioner,* T.C. Memo. 1963–321; *Collins v. Commissioner,* 56 T.C. 1074 (1971); *Reid v. Commissioner,* T.C. Memo. 1972–205.

would be carried away and that the areas would thereafter be completely incapable of supporting their future dairy farming.

In contrast to the *Dann* case, petitioners in this case never gave permission for the removal of all usable dirt. In fact, permission was not even given for the extraction of all gravel. Petitioners' topsoil was saved by Maudlin and was subsequently dumped into the pit dug by Mr. and Mrs. Wright. That movement of soil enabled petitioners to reclaim the previous Wright pit and swampland for their farming processes. Moreover, the 1974 and 1975 contracts indicate that petitioners intended to reseed the Lesher pit and return it to operational farmland. The 1974 and 1975 contracts provide that—

The strippings shall be removed for safekeeping to an area in the old pit which may be agreed upon by the parties and, when the gravel is removed, all large stones or rock shall be removed or buried below plow depth, and the strippings shall be replaced if feasible and, in any event, the strippings shall be levelled off so that the ground can be seeded. * * *

Mr. Lesher testified that the area actually was not reseeded, but instead the gravel pit captured water that was used for irrigating petitioners' farm. In our opinion, those factors contravene petitioners' argument.

Petitioners next assert that other than their lien they did not own any interest in the gravel actually severed and produced from their pit. However, as we concluded above, petitioners did retain a right to gravel stockpiled by Maudlin for use in resurfacing farm areas. Moreover, petitioners' contention misses the point. Most courts have insisted that the real question involves a taxpayer's interest in minerals in place. E.g., *Palmer v. Bender*, 287 U.S. 551 (1933); *Dingman v. United States*, 429 F.2d 70 (8th Cir. 1970); *Rabiner v. Bacon*, 373 F.2d 537 (8th Cir. 1967); *Green v. Commissioner*, 35 T.C. 1065 (1961). See also sec. 1.611–1(b)(1), Income Tax Regs. One exception was *Linehan v. Commissioner*, 297 F.2d 276 (1st Cir. 1961), revg. 35 T.C. 533 (1960), which referred to an economic interest in severed minerals; yet *Wood v. United States*, 377 F.2d 300, 309 n. 21 (5th Cir. 1967), cert. denied 389 U.S. 977 (1967), directly questioned the reasoning of *Linehan v. Commissioner, supra:*

First, the question is not whether the taxpayer retains an economic interest in the mineral once it has been removed, but rather whether, under the contract, the taxpayer retains an economic interest in the minerals in place. Secondly, as we have shown above, computation of compensation by a fixed price per unit

volume removed does not alter application of the economic interest test. See footnote 16 and accompanying text. See also Samuel L. Green, 1961, 35 T.C. 1065.

The Third Circuit Court of Appeals has also questioned the *Linehan* reasoning. *Laudenslager v. Commissioner*, 305 F.2d 686 (3d Cir. 1962), affg. a Memorandum Opinion of this Court. In *Laudenslager*, the court stated at page 692 n. 4:

4. Taxpayers have cited several decisions from other Circuits. In two of them, Crowell Land and Mineral Corp. v. Commissioner, 242 F.2d 864 (5th Cir. 1957), and Linehan v. Commissioner, 297 F.2d 276 (1 Cir. 1961), the facts are not significantly different from those in the instant case; yet the courts there ruled in favor of capital gain treatment, relying primarily on factors which, in our opinion, do not warrant the significance that was attributed to them and accordingly we disagree with their holdings. * * *

We have consistently considered the critical issue to be a taxpayer's interest in the gravel in place rather than his rights in severed gravel. See *Collins v. Commissioner*, 56 T.C. at 1076–1077.

Petitioners painstakingly examine those Eighth Circuit cases dealing with the question of a taxpayer's economic interest in minerals in place. Petitioners argue that this case should be controlled by *Commissioner v. Remer*, 260 F.2d 337 (8th Cir. 1958), affg. 28 T.C. 85 (1957). However, in our opinion, that case is clearly distinguishable from the instant case. In *Remer*, the taxpayer purchased from the State of Minnesota two stockpiled iron ore mining leases. More than 6 months thereafter, Remer gave written assignment of those leases to Charleson Iron Mining Co. Remer warranted that he was the owner of those leases and had good and perfect title to them. Charleson was bound to pay Remer 10 cents per ton of concentrates shipped from the leased properties. Additionally, Charleson was obligated to pay Remer a large absolute, initial sum of money for those leases, a factor that clearly distinguishes that case from the instant one. In concluding that the transaction was a sale of leases which entitled Remer to capital gains treatment, the Eighth Circuit relied heavily upon *Helvering v. Elbe Oil Land Development Co.*, 303 U.S. 372 (1938), which also had involved transactions with large initial payments. Because Maudlin made no such absolute or initial payment, we find those cases of no assistance to petitioners.

Petitioners next distinguish *Rabiner v. Bacon*, 373 F.2d 537

(8th Cir. 1967). In that case, the Eighth Circuit affirmed the District Court holding that the taxpayer realized ordinary income from a lease agreement which provided for the removal of minerals from the taxpayer's property. Unlike the Lesher-Maudlin "Agreements," the Rabiners' lease was not couched in terms of a sale; rather, the Eighth Circuit noted that the terminology reflected the usual words of a lease. Moreover, the Eighth Circuit reasoned that the minerals were held primarily for sale to customers in the ordinary course of business, thereby precluding the availability of capital gains treatment. As we have heretofore stated, the Leshers did not hold the minerals primarily for sale to customers in the ordinary course of business, and the contracts here involved are not blatantly written in lease phraseology. Therefore, the facts of the instant case require a different analysis from that used by the Eighth Circuit in *Rabiner*.

Lastly, petitioners attempt to distinguish *Dingman v. United States*, 429 F.2d 70, 71–72 (8th Cir. 1970). In that case, the Barton Contracting Co. contacted the taxpayers in an effort to acquire fill to be used for a highway project. The contract between Barton and Dingman provided that—

(1) The Caswell Engineering Company was to be employed to determine the amount and location of fill available for removal. (2) Barton was to remove 300,000 cubic yards of fill, if that amount of fill was available, provided that no materials were to be removed without Caswell's approval. (3) Barton was to pay Caswell's fees and costs if it took less than 200,000 cubic yards of fill or if less than that amount of fill was available to take. The taxpayers agreed to pay these costs if more than 200,000 cubic yards of fill was taken. (4) Barton was to pay the initial survey costs of the engineering company if less than 100,000 cubic yards of fill was found to be removable. (5) Barton was to have the right to remove the fill until Highway 47 was completed for a mile on either side of the taxpayers' property. (6) Barton was to pay the taxpayers at the rate of $0.15 per cubic yard of fill removed. The quantity removed was to be determined by the Minnesota Highway Department and payments to the taxpayers were to be in accordance with payments from the Highway Department to Barton.

A subsequent letter clarified that payments for the fill actually were not dependent upon the State Highway Department paying Barton. Instead, merely for convenience, the State Highway Department payments would control the timing and amount of payment due taxpayers. The court named the following controlling factors in deciding that the arrangement

between Dingman and Barton was a lease: (1) The risk of payment was predicated upon the availability of fill as determined by Barton's engineers; (2) removal of that amount of dirt from Dingman's property for State highway projects; and (3) measurements made by the State Highway Department.

A number of the same facts are present here which point to concluding that petitioners retained an economic interest in the gravel in place. In both cases, the quantity of fill or gravel to be removed was determined by an outside source. Payment was based on the amount of fill or gravel removed as measured by the highway authority.

As stated in *Kirby Petroleum Co. v. Commissioner*, 326 U.S. 599, 606 (1946): "The facts of each transaction must be appraised to determine whether the transferor has made an absolute sale or has retained an economic interest."

The facts in the instant case are similar to those in *Laudenslager v. Commissioner*, 305 F.2d 686 (3d Cir. 1962), affg. a Memorandum Opinion of this Court. There the court stated at page 692:

The sum total of the factual situation in the instant case is this: taxpayers owned land on which there was earth fill; they granted Brewster a contractual right to extract and remove some of it at a fixed unit price; Brewster did not contract to extract and remove *all* of the earth fill on taxpayers' property nor did it contract to extract and remove an absolute, inflexible *minimum* of the fill; and finally, the contract provided that Brewster was not required "to take or remove any material" which did not meet specifications of the Authority.

The legal result of this factual situation is this: there was no *sale* of the earth fill *in place;* taxpayers retained their economic interest in the earth fill prior to extraction; the payments made by Brewster for the extracted and removed fill, as the extractions and removals occurred, constituted ordinary income.

Here petitioners continued to participate in the risks of the extraction of the gravel from their pit. The contracts anticipated short-term performance, did not obligate Maudlin to remove all gravel from the Lesher pit, and indeed did not specify an absolute predetermined quantity of gravel to be removed. Maudlin was not obliged to remove any minerals not meeting the specifications of the Iowa Highway Commission and Wright County, and all payments depended solely upon the removal of the gravel from the pit.

On the basis of the record in this case, we conclude that petitioners depended solely on the extraction of the gravel for

the return of their capital. We therefore hold that the payments received by petitioners upon the removal of the gravel were ordinary income subject to depletion.

The final issue is whether the facility constructed by petitioners in 1974 qualifies for investment credit by virtue of being "section 38 property" as defined by section 48(a)(1)(B)(iii) or section 48(a)(1)(D). In pertinent part, section 38 property is defined as follows:

SEC. 48. DEFINITIONS; SPECIAL RULES.
  (a) SECTION 38 PROPERTY.—
    (1) IN GENERAL.—Except as provided in this subsection, the term "section 38 property" means—
      (A) tangible personal property, or
      (B) other tangible property (not including a building and its structural components) but only if such property—
        (i) is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or

    *  .    *     *     *     *     *     *

        (iii) constitutes a facility used in connection with any of the activities referred to in clause (i) for the bulk storage of fungible commodities (including commodities in a liquid or gaseous state), or

    *    *     *     *     *     *     *

      (D) single purpose agricultural or horticultural structures; * * *

Petitioners contend that the Morton structure is a storage facility "used in connection with" production in their farming business. For this reason, they contend that the structure is section 38 property and is not a building within the meaning of section 48(a)(1)(B).

Respondent contends that the Morton structure is a building as defined in section 1.48–1(e)(1), Income Tax Regs.[6]

---

[6]Sec. 1.48–1(e)(1), Income Tax Regs., insofar as here relevant provides:

(e) *Definition of building and structural components.* (1) Buildings and structural components thereof do not qualify as section 38 property. The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores. Such term includes any such structure constructed by, or for, a lessee even if such structure must be removed, or ownership of such structure reverts to the lessor, at the termination of the lease. Such term does not include (i) a structure which is essentially an item of machinery or equipment, or (ii) a structure which houses property used as an integral part of an activity specified in section 48(a)(1)(B)(i) if the use of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses is replaced. Factors which indicate that a structure is closely related to the

Petitioners contend that the structural portion of their facility constitutes a "storage facility," as defined in section 1.48–1(d)(5), Income Tax Regs.[7]

Respondent argues that a facility must be used exclusively for the bulk storage of fungible commodities to constitute section 38 property. Petitioners point out that respondent's regulations require only that the facility be used principally for the bulk storage of fungible commodities. Sec. 1.48–1(d)(5)(ii), Income Tax Regs. The word "principally" was not used in respondent's regulations prior to the 1971 amendment of section 48(a)(1). When section 48(a)(1) was amended in 1971 to require that the facility be for "bulk storage of fungible commodities," the House committee report with respect to the amendment referred to "used principally," stating:

> For a "storage" facility to be eligible for the credit, it must be used principally as a storage facility. Thus, if the facility has a work area in which more than a de minimis amount of processing and handling of the stored commodities can be carried on, it will not be considered to be used principally as a storage facility. If, however, the facility has an area for the housing of equipment directly related to the storage of the commodity, it will not be ineligible for treatment as a qualifying storage facility. [H. Rept. 92–533, 92d Cong., 1st Sess. (1971), 1972–1 C.B. 498, 575.]

Therefore, respondent's present regulations, as amended after the 1971 amendment to section 48(a)(1), which are the regulations covering the years here in issue, are in conformity with the committee report. Given its plain meaning, "principally" means a chief or main function. In our view, section 48(a)(1)(B)(iii)

---

use of the property it houses include the fact that the structure is specifically designed to provide for the stress and other demands of such property and the fact that the structure could not be economically used for other purposes. Thus, the term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, basic oxygen furnaces, coke ovens, brick kilns, and coal tipples.

[7]Sec. 1.48–1(d)(5), Income Tax Regs., provides:

(5)(i) *Research or storage facilities.* If property (other than a building and its structural components) constitutes a research or storage facility and if it is used in connection with an activity specified in subparagraph (1) of this paragraph, such property may qualify as section 38 property even though it is not used as an integral part of such activity. Examples of research facilities include wind tunnels and test stands. Examples of storage facilities include oil and gas storage tanks and grain storage bins. Although a research or storage facility must be used in connection with, for example, a manufacturing process, the taxpayer-owner of such facility need not be engaged in the manufacturing process.

(ii) In the case of property described in section 50, property will constitute a storage facility only if the facility is used principally for the bulk storage of fungible commodities. Bulk storage means the storage of a commodity in a large mass prior to its consumption or utilization. Thus, if a facility is used to store oranges that have been sorted and boxed, it is not used for bulk storage.

requires only that the principal function of a facility be for bulk storage of fungible commodities in order for the facility to qualify as section 38 property if the facility meets the other requirements of the statute and regulations.

This Court, in determining whether a structure is section 38 property, has looked to the "use" or "function" of the facility, as suggested by the regulations. *Catron v. Commissioner*, 50 T.C. 306 (1968); *Satrum v. Commissioner*, 62 T.C. 413 (1974). In *Catron v. Commissioner, supra*, the taxpayers were engaged in an apple farming operation in 1962.[8] That year, the taxpayers purchased and constructed a prefabricated, quonset-type structure to be used in connection with that business. One-third of the facility was a refrigeration unit used for the cold storage of boxed apples. Upon the sale of those apples, they were removed from that refrigeration unit and shipped to various buyers. Two-thirds of the quonset structure provided an area for taxpayers' selection, grading, and actual boxing of the apples during the picking season, which area was thereafter converted to a dry storage area for apples awaiting sale during the off-season. This Court held that the sorting and boxing area of the structure was a building, while the refrigeration unit which provided no work space was a storage facility entitled to section 38 property treatment. We reasoned that the area which was not entitled to the investment credit did not qualify because one of its purposes was providing working space. In short, the Court determined that even though on the whole a building and a structure are mutually exclusive, there is a narrow class of structures that render themselves susceptible of an allocation wherein one part qualifies substantively as a storage facility entitled to investment credit even though another portion does not so qualify.

The "use" or "function" test applied in *Catron v. Commissioner, supra*, in determining whether a structure was a "building" or "storage facility," approved and adopted the test set forth in Rev. Rul. 66–89, 1966–1 C.B. 8.[9] This ruling and the *Catron* case

---

[8]Although *Catron v. Commissioner*, 50 T.C. 306 (1968), concerned a year prior to the amendment of sec. 48(a)(1) requiring that the storage facility be for the "bulk storage of fungible commodities," it is still viable with respect to the "use" or "function" test therein applied.

[9]Rev. Rul. 66–89, 1966–1 C.B. 8, states:

(5) *Storage facilities.* If property (other than a building and its structural components) is a storage facility used in farming, such as the cultivation of the soil or the raising of livestock, and if it cannot be reasonably adapted to other uses, it qualifies as "other tangible property" within the meaning of

both hold that the structure qualifies as a storage facility if (1) it cannot be reasonably adapted to other uses, and (2) provides merely storage space rather than working and storage spaces. *Catron v. Commissioner, supra* at 315; *Central Citrus Co. v. Commissioner*, 58 T.C. 365, 371 (1972). Mr. Lesher testified that the only work performed in petitioners' structure is incidental to the storage and feeding processes. Hay is funneled into the structure via a grain elevator attached to the side of the structure; the only human work involves the stacking of hay for storage and later removal. We conclude that this work is de minimis and therefore petitioners' structure does not include sufficient working spaces to cause it, for that reason, not to be used principally for storage.

Petitioners argue that the structure is not reasonably adaptable to uses other than the storage of hay. While petitioners admit that the building was originally designed by Morton Buildings as a general purpose livestock barn, petitioners insist that the structure with its design as modified by Mr. Lesher was neither intended nor used for any purpose other than the storage of hay. Petitioners maintain that the structure has never housed animals and is incapable of storing farm machinery.

Respondent argues that all improvements to the facility are incidental to petitioners' cattle-feeding operation rather than to facilitate the storage function of the structure. Respondent points out that not only does Morton Buildings refer to the structure as a "general livestock barn," but petitioners in their 1974 and 1975 Federal income tax returns refer to the facility as a "cattle raising" structure. Respondent further supports his position by indicating that all improvements—the concrete sloped floor, the cattle gates, and the permanent planking—act as restraining devices against the cattle and for disposal of their waste. In response to questions by respondent's counsel, Mr. Lesher admitted that if the cattle barriers were removed the structure would house a large open space. That space would be

---

section 48(a)(1) of the Code, regardless of whether it is a temporary or a permanent facility. Typical storage facilities on farms include grain storage bins, corn cribs and silos. These are all to be distinguished from farm buildings which do not qualify as section 38 property, such as barns, stables, poultry houses and warehouses. All of these contain space within which the farmer works and carries on his farming activities and are ineligible for the credit because they fall within the definition of the term "building." A storage facility, as above illustrated, provides the farmer only storage space but not working space.

unobstructed except for 6- by 6-foot support posts located every 18 feet.

While petitioners presently are not interested in modifying their usage of the structure, we agree with respondent that this particular structure is not itself restricted in its functions. Unlike the refrigeration compartments in *Catron v. Commissioner, supra,* and the chicken-raising facility in *Satrum v. Commissioner,* 62 T.C. 413 (1974), petitioners' facility does not contain a special unit or special construction features which would prevent the spaces presently used for hay storage to later be used as openwork areas. Moreover, in part, the present function of the facility is for a substantive use other than storage. The facility is now a cattle-raising structure with two main purposes—hay storage and cattle feeding. Unlike corn cribs, storage bins, and oil tanks, this structure is easily adaptable to usage other than for storage of hay and, in fact, is in substantive part being used for another function, cattle feeding. For these reasons, the Morton structure is a building within the definition provided by section 1.48–1(e)(1), Income Tax Regs.[10]

Although Mr. Lesher has testified that his structure is too small to house machinery, was not intended and is not used to house the cattle, and provides the only feasible place to store hay, he does not assert that remodeling of the structure would be economically unfeasible.[11] In fact, he did not state that it could not be used for other farm purposes without remodeling. Certainly, if necessary at a future time, a south wall could be erected to entirely enclose the interior of the facility. Moreover,

---

[10]Our position here is in accord with *Olson v. Commissioner,* T.C. Memo. 1970–296. In *Olson,* taxpayers erected several quonset-type structures, which were used 90 percent of the time to store grain, while housing certain farm equipment, seed, and fertilizer at various other times. The Court noted that the quonset-type structures were available for multiple functional uses and cited that a similar building, not in issue, was primarily used as a machine shed to house various pieces of farm equipment. The Court distinguished *Catron v. Commissioner,* 50 T.C. 306 (1968), by finding that unlike the refrigeration equipment therein, Mr. Olson's structures were not unfit for other usage. Therefore, the Court held that Mr. Olson was not entitled to investment credit.

[11]The economic feasibility rule enunciated in *Satrum v. Commissioner,* 62 T.C. 413 (1974), and *Walter Sheffield Poultry Co. v. Commissioner,* T.C. Memo. 1978–308, is not unlike the position taken by the Internal Revenue Service. Sec. 1.48–1(e)(1), Income Tax Regs., states:

"Factors which indicate that a structure is closely related to the use of the property it houses include the fact that the structure is specifically designed to provide for the stress and other demands of such property and the fact that the structure could not be economically used for other purposes. Thus, the term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, basic oxygen furnaces, coke ovens, brick kilns, and coal tipples."

Mr. Lesher does not take the position that it is reasonable to expect replacement or abandonment of the entire facility if he later abandons its hay storage function.

Petitioners next argue that the function test is not the sole test. They assert that even if we determine that the "cattle raising" facility functions as a building, we must also find its appearance to be that of a building. Petitioners cite *Yellow Freight System, Inc. v. United States,* 538 F.2d 790 (8th Cir. 1976), and *Starr Farms, Inc. v. United States,* 447 F. Supp. 580 (W.D. Ark. 1977), to support their contention. *Yellow Freight System, Inc.,* concerned loading docks having the sole purpose of providing work space for taxpayer's employees. Those loading docks were used to elevate the employees to enable them to easily reach the trucks being loaded. In holding these docks to be "buildings" the Eighth Circuit stated at pages 797–798: "Appearance and function are not mutually exclusive. Indeed a given structure is designed to accommodate the functions for which it is to be used. Thus consideration of appearance adds to, instead of detracts from, the common understanding of the term building."

*Starr Farms, Inc. v. United States, supra,* which petitioners cite as a contrast to the structure here involved, concerned environmentally-controlled chicken houses. In reaching a conclusion contrary to that reached in the *Satrum* case, the District Court held that the poultry houses functioned as and appeared to be buildings. The Court described each structure as having four walls and a roof and an environment permanently similar to any other ordinary farm building.

In applying the appearance test as set forth by the Eighth Circuit, we hold that the appearance of petitioners' facility is, in fact, that of a building. It is not substantially dissimilar from an ordinary barn used for the raising of livestock. Accordingly, we hold that neither the appearance nor the function test can be construed in favor of petitioners.

Respondent also argues that the baled hay does not constitute the bulk storage of a fungible commodity. Petitioners take the contrary position, contending that each bale of hay is interchangeable for another bale.

Prior to 1971, section 48(a)(1) defined section 38 property as including—

(B) other tangible property (not including a building and its structural components) but only if such property—
  (i) is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or
  (ii) constitutes a research or storage facility used in connection with any of the activities referred to in clause (i), * * *

The Revenue Act of 1971, Pub. L. 92–178, sec. 104(a)(1), 1972–1 C.B. 443, 445, changed subsection (ii) and included subsection (iii), which reads:

(iii) constitutes a facility used in connection with any of the activities referred to in clause (i) for the bulk storage of fungible commodities (including commodities in a liquid or gaseous state, * * *

In amending section 48(a)(1)(B), Congress intended to narrow the class of storage facilities qualifying as section 38 property:

Since the Internal Revenue Service has encountered significant difficulties interpreting this provision [section 48 of the Code], the committee believes it is desirable to clarify the law regarding the types of storage facilities * * * which are entitled to the credit. [S. Rept. 92–437, 92d Cong., 1st Sess. (1971), reprinted in [1971] U.S. Code Cong. & Adm. News 1918, 1936.]

The House Conference Committee report further expresses this intent:

The Senate amendment clarifies the provision of present law relating to storage facilities (section 48(a)(1)(B)(ii) of the Code) so as to make it clear that such provision applies only to facilities for the bulk storage of fungible commodities, including commodities in a liquid or gaseous state. [H. Conf. Rept. 92–708, 92d Cong., 1st Sess. (1971), reprinted in [1971] U.S. Code Cong. & Adm. News 2053, 2056.]

The only case to which our attention has been directed or we have found dealing with storage facilities constructed after 1971 which required an interpretation of the meaning of "bulk storage of fungible commodities" is *Merchants Refrigerating Co. of California v. United States,* an unreported case (E.D. Cal. 1979, 43 AFTR 2d. 818, 79–1 USTC par. 9270). There, the taxpayers provided cold storage facilities for frozen fruits and vegetables. The *Merchants Refrigerating* case discussed in detail numerous cases, largely warehouse cases, involving the definition of fungible commodities. None of those cases discussed involved investment credit. The *Merchants Refrigerating* case is not factually similar to the instant case. Since we have concluded that petitioners' facility does not meet other require-

ments of the statute and regulations for a "storage facility," it is unnecessary for us to decide whether baled hay is a fungible commodity or whether storage of baled hay is bulk storage.

Petitioners alternatively argue that Pub. L. 95–600, 92 Stat. 2827–28, of the Revenue Act of 1978, amends section 48(a)(1) to nullify the negative effects of the appearance test in determining whether a facility is a storage facility.[12] On the other hand, respondent correctly argues that Pub. L. 95–600 does not modify the storage facility provision of section 48(a)(1)(B)(iii). Instead, the Revenue Act of 1978 amended section 48(a)(1) to include subsection (d), which is entitled "single purpose agricultural or horticultural structures" and is given meaning by section 48(p)(2). Section 48(p)(2) states:

(2) SINGLE PURPOSE LIVESTOCK STRUCTURE.—The term "single purpose livestock structure" means any enclosure or structure specifically designed, constructed, and used—

(A) for housing, raising, and feeding a particular type of livestock and their produce, and

(B) for housing the equipment (including any replacements) necessary for the housing, raising, and feeding referred to in subparagraph (A).

Respondent argues that petitioners' facility does not qualify as a section 48(a)(1)(D) structure because it is a multipurpose structure.

H. Rept. 95–1800, 95th Cong., 2d Sess. (1978), 1978–3 C.B. 523, 561, states:

In order to be included under this provision, a livestock structure must be specifically designed, constructed, and used for the housing, raising and feeding of livestock and their produce. * * * The full range of livestock breeding, raising and production activities is intended to be included so that special purpose structures will qualify for credit if used, for example, to breed chickens or hogs, to produce milk from dairy cattle, or to produce feeder cattle

---

[12]The trial of this case was held on Sept. 18, 1978. At the trial, petitioners' only contention was that the Morton structure was principally a storage facility for the bulk storage of fungible commodities. Pub. L. 95–600, 92 Stat. 2827–28, of the Revenue Act of 1978, was signed by the President on Nov. 6, 1978. Although under the provision of this law, sec. 48(a)(1)(D), I.R.C. 1954, as amended, was retroactive to 1971, petitioners could not at trial have contended that the amended section was applicable to their case. On brief, petitioners do not specifically contend that the Morton structure is a single purpose livestock structure within the meaning of sec. 48(a)(1)(D), I.R.C. 1954, but rather they argue that this provision modifies the requirements of a storage facility defined in sec. 48(a)(1)(B)(iii). Respondent, in his reply brief, pointed out that petitioners had incorrectly construed the provision of sec. 48(a)(1)(D) and further argued that the Morton structure was not a single purpose livestock structure within the meaning of sec. 48(a)(1)(D), I.R.C. 1954, as defined in sec. 48(p)(2). We therefore consider that the issue of whether the Morton structure is a single purpose livestock structure under sec. 48(a)(1)(D), I.R.C. 1954, is before us by consent of the parties. Compare *Redding v. Commissioner*, 71 T.C. 597, 605 (1979).

or pigs, broiler chickens, or eggs. In addition, the structure or enclosure must be designed and used to house equipment necessary to feed and care for the livestock. As a result, such facilities must include, as an integral part of the structure or enclosure, equipment to contain the livestock and to provide water, feed and temperature control, if necessary.

\* \* \* \* \* \* \*

It should be emphasized that the structure must be used exclusively for the purpose for which it was specifically designed and constructed. As a result of this requirement, a hog structure will not be eligible property, for example, if it is used for the housing and feeding of poultry or cattle or if more than incidental use of a structure is made to store feed or machinery. \* \* \*

S. Rept. 95–1263, 95th Cong., 2d Sess. (1978), 1978–3 C.B. 315, 415, highlights the application proposed for section 48(a)(1)(D):

Also, a structure ceases to be a qualifying structure if it is used for a purpose (such as for storage of feed or equipment) which does not qualify it for the investment credit under this or other definitions of qualifying property.

It is intended that this provision be broadly construed to apply to all types of special purpose structures and enclosures used to breed, raise and feed livestock and poultry \* \* \* . Thus this provision will cover unitary hog, poultry, and cattle raising systems, \* \* \*

In applying the Senate and House reports to this case, we are of the opinion that the structure does qualify as a single purpose agricultural structure. We earlier determined that petitioners specifically designed, constructed, and have used the facility for the raising and feeding of livestock. Although petitioners have stressed their use of the structure for storage of hay, the facts show that the building was laid out specifically to accommodate the convenient feeding of the cattle with this stored hay. The hay was not stored in the structure to be sold or to be carried to another location to feed the cattle. Considering all the facts in this record, we conclude that the storage of the feed (hay) was incidental to the use of the structure as a feeding facility. Mr. Lesher testified that the structure is not used to house the cattle, but rather to feed them. However, he stated that cattle infrequently have sought shelter there when protection from the weather has been necessary. There was no other shelter provided on the farm for the cattle since generally they need no shelter.

Considering these facts, in our view the facility provides the full range of livestock-raising activities necessary in petitioners' operations and is the only structure used by petitioners for "housing, raising, and feeding" cattle. In broadly constructing section 48(a)(1)(D) as intended by Congress, we hold that

petitioners are entitled to an investment credit on the Morton structure as a single purpose livestock structure.

*Decision will be entered under Rule 155.*