Aloyius T. and Gladys **DINGMAN**,
Appellees,

v.

**UNITED STATES of America**,
Appellant.

No. 19893.

United States Court of Appeals,
Eighth Circuit.

July 21, 1970.

David E. Carmack, Atty., Dept. of Justice, Washington, D. C., for appellant, and filed brief; Johnnie M. Wal-ters, Asst. Atty. Gen., and Lee A. Jackson and Grant W. Wiprud, Attys., Washington, D. C., and Robert G. Renner, U. S. Atty., Minneapolis, Minn., and Joseph T. Walbran, Asst. U. S. Atty., were on the brief with Mr. Carmack.

Dennis M. Mathisen, of Lindquist & Vennum, Minneapolis, Minn., for appellee, and filed brief; David E. Krause, Minneapolis, Minn., was on the brief with Mr. Mathisen.

Before MATTHES, Chief Judge, and LAY and HEANEY, Circuit Judges.

HEANEY, Circuit Judge.

The government appeals from the decision of the District Court granting the taxpayers' request for a tax refund. The issue posed is a narrow and often litigated one: Whether payments received for fill taken from the taxpayers' land should be treated as capital gains or as ordinary income subject to depletion allowances.

In 1943, the taxpayers purchased a 145-acre tract of land upon which they constructed and operated a riding stable. In 1964, the State of Minnesota condemned a five-acre strip of that tract for the purpose of constructing a section of Highway 47. The Barton Contracting Company, the highway contractor, contacted the taxpayers with respect to the acquisition of fill to raise the grade of the highway. The taxpayers were willing to sell fill to Barton but wanted to ensure that the removal of fill would not damage the marketability of the property for use as industrial building sites.

After negotiation, an agreement was reached whereby: (1) The Caswell Engineering Company was to be employed to determine the amount and location of fill available for removal. (2) Barton was to remove 300,000 cubic yards of fill, if that amount of fill was available, provided that no materials were to be removed without Caswell's approval. (3) Barton was to pay Caswell's fees and costs if it took less than 200,000 cubic yards of fill or if less than that

amount of fill was available to take. The taxpayers agreed to pay these costs if more than 200,000 cubic yards of fill was taken. (4) Barton was to pay the initial survey costs of the engineering company if less than 100,000 cubic yards of fill was found to be removable. (5) Barton was to have the right to remove the fill until Highway 47 was completed for a mile on either side of the taxpayers' property. (6) Barton was to pay the taxpayers at the rate of $0.15 per cubic yard of fill removed. The quantity removed was to be determined by the Minnesota Highway Department and payments to the taxpayers were to be in accordance with payments from the Highway Department to Barton.

Shortly after the contract was entered into, a letter of agreement was sent by the taxpayers' attorneys and was signed by Barton. In substance, the letter: (1) clarified the fact that payment for the materials purchased in no way depended upon payment by the State Highway Department although their determinations would, as a matter of convenience, control the amount and timing of payment from Barton to the taxpayers; (2) indicated that the contract called for a minimum purchase of 300,000 cubic yards of fill, if available, and then increased that minimum to 400,000 cubic yards, if available; and (3) reiterated the taxpayers' concern with preparing the property for possible sale.

On their 1965 income tax return, the taxpayers reported $30,300 of income as "sale of farm soil in place" and treated the sum as a capital gain. Upon audit of the return, the Commissioner of Internal Revenue determined that the payments should have been treated as ordinary income, thus increasing the taxpayers' liability by $4,005.33. Thereafter, the Commissioner assessed a tax and interest deficiency against the taxpayers of $4,332.34. The taxpayers paid the deficiency, filed their claim for refund and, after six months, brought this action for recovery of taxes.

The District Court held for the taxpayers stating:

"By the Agreement Barton was obligated to take all the fill on Dingman's property which could be removed without lowering the value of the property as a building site, up to 400,000 cubic yards. Barton was also obligated to pay Dingman fifteen cents per cubic yard. The Agreement was, in effect, a sale of all the fill available on Dingmans property, not a lease of mining or extraction rights. Barton was obligated to pay for all the fill available on the land, even though the exact amount available would not be determined until after the contract was signed and the engineering survey made."

■ It is clear, and the parties so concede, that this case is controlled by the "economic interest" test. The "economic interest" test provides that payments received for minerals are ordinary income subject to depletion allowance if the taxpayer (1) has acquired by investment any interest in the natural deposit, and (2) looks to the extraction of the mineral for the return of his capital. Commissioner of Internal Revenue v. Southwest Explor. Co., 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347 (1956); Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489 (1933); Burnet v. Harmel, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199 (1932); Rabiner v. Bacon, 373 F.2d 537 (8th Cir. 1967). Only the second aspect of this test is relevant to our determination.

■ We start with the premise that in reviewing the lower court's interpretation of the contract between the taxpayers and Barton, we are not bound by the "clearly erroneous" standard of Rule 52(a). Arrow Equipment, Inc. v. M–R–S Manufacturing Company, 416 F.2d 152 (8th Cir. 1969); United States v. John McShain, Inc., 103 U.S.App.D.C. 328, 258 F.2d 422, cert. denied, 358 U.S. 832, 79 S.Ct. 52, 3 L.Ed.2d 70 (1958).

In order to effectuate the meaning of the entire contract, we think it must be read as obligating Barton to remove a minimum of 400,000 cubic yards of fill if that amount was available on the

property and if that amount was needed to complete the highway one mile on either side of the taxpayers' land. The taxpayers argue that paragraph 7 which states:

> "Barton shall have the right to remove fill as aforedescribed until Minnesota Highway No. 47 shall be completed for at least a distance of a mile on either side of the aforedescribed property."

merely established a time period in which the contract obligation to remove the fill available was to be completed. However, when paragraph 7 is read in conjunction with paragraph 3, which provides for payment to be made in accord with measurements made by the Minnesota Highway Department Project Engineer, we think it clear that Barton's obligation to purchase fill also depended on the requirements of the highway project. This view is supported by the language in both the original contract and in the subsequent letter of agreement indicating that the sum to be paid the taxpayers was to be determined by measurements of the Highway Department indicating the amount of fill actually used. Furthermore, the deposition of Mr. Dingman indicates that Barton removed fill until his contract with the State was completed and that the payments Dingman received from Barton were completely determined by the measurements made by the State Highway Department.

 Under these circumstances, we feel obligated to read the contract as conditioning Barton's obligation to purchase fill on (1) the availability of the fill as determined by the taxpayers' engineers, and (2) the amount of fill needed to satisfy Barton's contract with the State Highway Department. When the contract is interpreted in this manner, it becomes clear that this case is controlled by Laudenslager v. C. I. R., 305 F.2d 686 (3rd Cir. 1962), cert. denied, 371 U.S. 947, 83 S.Ct. 501, 9 L.Ed.2d 497 (1963). In *Laudenslager*, the taxpayers' contract to sell fill called for an initial minimum purchase of 400,000 cubic yards. However, that minimum was subject to (1) acceptance of the material by the New Jersey Highway Authority, and (2) modification in the requirements of the highway project for which the purchaser was providing fill. In analyzing the contract, the Court concluded:

> "The legal result of this factual situation is this: there was no *sale* of the earth fill *in place*; taxpayers retained their economic interest in the earth fill prior to extraction; the payments made by [the purchaser] for the extracted and removed fill, as the extractions and removals occurred, constituted ordinary income." (Emphasis included.)

Laudenslager v. C. I. R., *supra* at 692.

The decision in *Laudenslager* was cited with approval by this Court in Rabiner v. Bacon, 373 F.2d 537 (8th Cir. 1967).

 Furthermore, tax consequences of transactions are to be governed by their substance, not their form. Commissioner of Internal Revenue v. P. G. Lake, Inc., 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958); Rutledge v. United States, 428 F.2d 347 (5th Cir. 1970). Application of the economic interest test may require that we look beyond the language of the agreement to the economic realities of the transaction. Rutledge v. United States, *supra*. See also, Commissioner of Internal Revenue v. Southwest Explor. Co., 350 U.S. 308, 315–316, 76 S.Ct. 395, 100 L.Ed. 347 (1956). Here, the manner of determining payment, the method of payment and the actions of the parties, independent of the precise wording of the contract, indicate that the taxpayers did in fact retain an economic interest in the fill on their property. The taxpayers had no knowledge on their own of the quantity of fill available or of the amount removed; Barton took only the fill necessary to complete his contract and paid the taxpayers according to the measurements made by the Highway Department; and the Highway Department paid Barton for fill used on the highway, periodically determining the

amount of fill removed from the taxpayers' property to establish its payment to Barton. On the basis of these facts, the payments received by the taxpayers were in fact dependent upon the extraction and removal of fill from their property.

Accordingly, the judgment of the District Court is reversed and the case is remanded for entry of judgment for the appellant.