CAMPBELL P. RIDLEY AND EVELYN S. RIDLEY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1814–71. Filed June 8, 1972.

*Billy C. Jack*, for the petitioners.
*John B. Harper*, for the respondent.

TIETJENS, *Judge:* The Commissioner determined deficiencies in the income tax liability of petitioners for the taxable years 1967 and 1968 as follows:

| Year | Deficiency |
| --- | --- |
| 1967 | $353.46 |
| 1968 | 513.00 |

The sole issue for our determination is whether payments received by petitioners under a contract to mine and remove phosphate from their land should be treated as gain from the sale of a capital asset or as ordinary income subject to depletion.

### FINDINGS OF FACT

The parties have stipulated certain facts which, together with the attached exhibits, are incorporated herein by this reference.

Campbell P. Ridley and his wife, Evelyn Shapard Ridley, petitioners herein, filed joint Federal income tax returns for the calendar years 1967 and 1968 with the district director of internal revenue in Nashville, Tenn. At the time the petition in this case was filed they resided in Columbia, Tenn.

In 1943 Campbell P. Ridley and his brother, William, received from their father the title as tenants in common to a large tract of land

situated in Columbia, Tenn. Five years later they partitioned the tract, but at that time the brothers agreed that they would continue to use the land for farming, as they had since they acquired it. Previously the brothers entered into an equal partnership for that purpose, and the partnership continued.

It was also agreed, however, that any income derived from the sale or lease of the land for uses other than farming would inure to the brother holding title to the parts of the tract so used. Campbell Ridley owned an area of approximately 29.6 acres which contained valuable deposits of phosphate.

In August 1967 the Monsanto Co., which was in the business of mining phosphate for use in commercial products, approached Campbell Ridley with an offer to exploit the phosphate resources. Prospecting data collected from a geological survey of the tract that had been conducted by Monsanto indicated that there were potentially 116,000 tons of the phosphate there. On August 16, 1967, petitioners executed a writing captioned "Contract Granting Rights To Mine And Remove Phosphate On A Royalty Basis." A shortened form of the agreement was recorded with the local office for the registry of deeds.

The terms of the contract provide that Monsanto was to pay petitioners $6,000 in 1967, $8,000 in 1968, and $6,000 in 1969. These amounts were paid in the respective taxable years and reported, not on petitioners' individual returns for those years, but on the Ridley Brothers' partnership returns. The parties now agree that the full amount of those payments are reportable by petitioners as their individual income. Petitioners reported only half those amounts on their individual returns for the taxable years in question. Petitioners treated the amounts actually reported as long-term capital gain and they contend that this was correct and that the amounts finally includable should also be so treated. The Commissioner determined in the statutory notice of deficiency that these amounts should have been treated as ordinary income, but he also treated the payments as the income of the partnership and not as the individual income of petitioners.

The pertinent parts of the formal contract concluded by Monsanto and petitioners are reproduced below; after reciting the date of the agreement and the names of the parties, the contract provides:

For and in consideration of the sum of One Dollar ($1.00), cash in hand paid by Monsanto to Owner, the receipt of which is hereby acknowledged, of the royalty to be paid to the Owner by Monsanto as hereinafter set out, and the mutual agreements herein contained, the parties hereto agree as follows:

Owner grants, gives and assigns to Monsanto, its successors and assigns, the exclusive right, power and privilege to mine, quarry, remove and dispose of all the phosphate, phosphate rock and phosphate bearing materials, hereinafter collectively called "Phosphate", in, on and under certain lands of Owner located in the 9th Civil District of Maury County, Tennessee, hereinafter for convenience

called "Lands", more fully bounded and described as follows:
[The legal description of the aforesaid 29.6 acres follows.]

The royalty to be paid to the Owner by Monsanto for the exclusive rights to mine and remove Phosphate, and the easements and privileges granted by this contract is the sum of Forty Cents (40¢) for each dry net ton of Phosphate of 2,000 pounds. Monsanto agrees to make the following advance royalty payments to Owner:

(a) The sum of Six Thousand Dollars ($6,000.00) to be paid to Owner upon the execution and delivery of this mining contract, representing payment in full for royalty due on the first fifteen thousand (15,000) tons of Phosphate to be mined and removed from said Lands. Owner hereby acknowledges receipt of said payment.

(b) The sum of Fourteen Thousand Dollars ($14,000.00) to be paid to Owner, representing payment in full for royalty due on the next thirty-five thousand (35,000) tons of Phosphate, over and above the tonnage provided for in (a) above to be mined and removed from said Lands. Said sum of Fourteen Thousand Dollars ($14,000.00) shall be paid to Owner as follows: Eight Thousand Dollars ($8,000.00) on the 10th day of January, 1968, and the sum of Six Thousand Dollars ($6,000.00) on January 10, 1969. Monsanto's obligation to make such installment payments shall not, however, affect or limit Monsanto's right to mine and remove, at any time, whatever quantity of Phosphate it desires, whether more or less than that for which an installment payment has been or is to be made.

It is expressly understood, however, that Monsanto in its sole discretion may, at any time, but shall not be obliged to, mine and remove more than fifty thousand (50,000) tons for which said advance royalty payments, either as the initial payment or as installment payments, have been or are to be made. For all Phosplate mined and removed by Monsanto in excess of such tonnage, Monsanto shall pay to Owner a royalty at the above rate of Forty Cents (40¢) per ton, said royalty payments for such excess Phosphate mined and removed during a given month to be made on or before the 20th day of the following month. Monsanto's weights and moisture determination of said Phosphate and methods therefor shall govern. Monsanto agrees that at monthly intervals after operations begin it will furnish Owner a statement of the number of tons that have been mined and removed by Monsanto and Owner shall have the privilege at any time during reasonable hours to inspect Monsanto's scales and records relating to the weight of the Phosphate.

The following terms, conditions and agreements between the parties hereto are part of this mining contract and shall cover the mining to be done in the future:

The time for mining and removing Phosphate and the use and exercise of the rights, privileges and use of the easements hereinafter granted shall be for a period of eight (8) years from the date of this mining contract. Provided, however, that Monsanto shall have the privilege of extending the period of this contract for additional periods of one (1) year, not to exceed a total of two (2) additional years, for a consideration of One Thousand Dollars ($1,000.00) per year. Monsanto may exercise the privilege of extending the term of this agreement by giving notice of its intention to do so not less than sixty (60) days prior to the termination of the original eight (8) year lease, or not less than sixty (60) days prior to the termination of the first annual extension thereof. Such notice may be addressed to Owner, Mt. Pleasant Pike, Columbia, Tennessee. The One Thousand Dollars ($1,000.00) consideration for such annual extensions, if exer-

cised by Monsanto, shall be payable within sixty (60) days after such notice. At the expiration of the eight (8) year term of this contract, or any extension thereof as herein provided, all rights and interests granted or given to Monsanto shall revert to Owner, Owner's heirs and assigns. At Owner's request, Monsanto agrees that it will within six (6) months thereafter execute and cause to be recorded in the Register's Office of Maury County, Tennessee, a full and complete release and satisfaction of all rights and privileges granted to it by Owner.

\* \* \* \* \* \* \*

Monsanto agrees to mine all Phosphate now known to it, or which may be discovered by it during its mining operations but it is understood and agreed that Monsanto will not be required to mine and remove any Phosphate unless it grades 40% BPL and will wash to 60% BPL, with a 45% recovery by weight after washing; nor will Monsanto be required to mine any phosphate where its thickness is less than three feet, or where the ratio of overburden to Phosphate is more than four to one. It is further understood and agreed that Monsanto will not be required to mine areas of less than one acre.

\* \* \* \* \* \* \*

The easements, rights, and privileges herein granted to said Monsanto, its successors or assigns, are exclusive and no easements, rights or privileges shall be sold, given or granted to any other persons, form or corporation and no use shall be made of said Lands which shall in any way or to any extent interfere or conflict with the exclusive right and privilege granted to Monsanto to mine and remove the Phosphate or the exercise of said easements, rights and privileges by Monsanto.

\* \* \* \* \* \* \*

The rights of either party hereunder may be assigned, in whole or in part and the provisions and conditions hereof shall inure to the benefit of and be binding upon the heirs, successors and assigns of the parties hereto, but no change or division in ownership, of any of said Lands or royalties, however accomplished, shall operate to enlarge the obligations or diminish the rights of Monsanto. No change in the ownership of any of said Lands and no sale, transfer or assignment of this contract by Owner or any interest herein or any royalties payable hereunder shall be binding on Monsanto unless and until Monsanto shall have received from Owner a written notice of such change, sale, transfer or assignment, including the name and address of the transferee or assignee, and a certified copy of the instrument or instruments evidencing such change, sale, transfer or assignment.

The contract payments for the first 50,000 tons of phosphate, which were denominated "advance royalty payments" in the contract, were of a type often made to landowners. It was Monsanto's policy to accommodate the owners with such lump-sum payments if they needed ready cash, but Monsanto usually paid no more than 75 percent of the anticipated value of a deposit. It was also customary for the owners to retain the payments even though Monsanto was unable to extract sufficient ore to recoup its outlay at the contract rate. In this case Monsanto paid a total of $20,000 for the first 50,000 tons of phosphate and it agreed to pay 40 cents for each additional ton, to be mined from a deposit that promised to yield 116,000 tons. No phosphate has yet

been removed from petitioners' land, but petitioners are not obligated to restore to Monsanto any of the "advance royalty payments" they received.

## OPINION

We are asked to determine whether the payments of $6,000 and $8,000 received by petitioners in 1967 and 1968 respectively constituted gain from the sale of a capital asset, as they contend, or whether the payments constituted ordinary income from a mineral lease subject to annual deductions for depletion under section 611, I.R.C. 1954, as the Commissioner contends. The question is solely one of the proper characterization of the contract concluded by petitioners and Monsanto The parties are in apparent agreement that the phosphate otherwise qualified as a capital asset. It is also undisputed that should we find a sale took place the gain was long-term capital gain.

It is settled that the body of law governing the treatment of oil and gas rights is applicable to "hard mineral" cases such as ours. *Wood* v. *United States*, 377 F.2d 300, 304 (C.A. 5, 1967). Thus a determination that petitioners gave up their entire economic interest in the phosphate is a prerequisite to our finding that a sale took place. In *Palmer* v. *Bender*, 287 U.S. 551 (1933), the Supreme Court announced a two-pronged standard that holds that the taxpayer holds an economic interest if he has (1) acquired, by investment, any interest in the mineral in place and (2) has secured by legal relationship income derived from the extraction of the mineral, to which he must look for a return of his capital. 287 U.S. at 557. We note that petitioners did not acquire the tract by investment, but we know of no reason why that fact alone should lead us to conclude that they did not hold an economic interest in the phosphate.

In *Palmer* the taxpayer contended, in contrast to petitioners' contention herein, that he was entitled to depletion deductions, and a finding that the taxpayer had retained an economic interest was essential if he was to prevail. However, the principles announced in that case are also controlling when the inquiry is, as here, whether the economic interest has been totally surrendered. *Rabiner* v. *Bacon*, 373 F.2d 537, 538 (C.A. 8, 1967).

Petitioners argue that the payments received in the taxable years in issue, which are attributable to the first 50,000 tons of ore removed, should be treated as capital gain because petitioners were under no duty to refund any part of those payments if Monsanto was unsuccessful in exploiting the deposit. They necessarily imply by this argument that the payment terms relating to the first 50,000 tons ought to be severed for tax purposes from the provision for tonnage payments of 40 cents for each additional ton removed over 50,000. Undoubtedly

petitioners are to look to extraction of the phosphate for the return of the portion of their capital represented by the tonnage payments, and thus the question remains whether this is not also true of the fixed payments.

While petitioners are not without precedent supporting severability,[1] that approach would be unwarranted in this case. There was in fact only one contract rate applicable to every ton of ore removed, since the price per ton of the first 50,000 equaled that of each additional ton removed. Monsanto did not obligate itself to furnish any additional consideration for the first 50,000. That being the case, we cannot see how the fixed payments can be properly denominated anything other than an advance royalty, the term of art which the contracting parties chose to employ and which is a badge of a mineral lease, not a sale. *Ollie G. Rose*, 56 T.C. 185, 190 (1971) ; *Don C. Day*, 54 T.C. 1417, 1422 (1970). Since it is clear that an advance royalty may also be a guaranteed payment, the unconditional character of the fixed payments, which petitioners have emphasized, cannot preclude our finding the contract a lease. See *Gitzinger* v. *United States*, 404 F.2d 191, 194 (C.A. 6, 1968) ; *Wood* v. *United States, supra* at 307.

We hold that the transaction involved in this case was not a sale of the phosphate but was a mineral lease giving Monsanto the right to mine for a stated consideration.

*Decision will be entered under Rule 50.*

---

[1] *United States* v. *White*, 311 F. 2d 399, 403 (C.A. 10, 1962).