ROBERT G. O'CONNOR AND MARY A. O'CONNOR, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3483–78–3485–78, 381–79.     Filed January 4, 1982.

*Kenneth L. Campbell,* for the petitioners in docket Nos. 3483–78, 3484–78, and 3485–78.

*James T. O'Hare, William Waller,* and *Teresa H. Johnson,* for the petitioners in docket No. 381–79.

---

[1]Cases of the following petitioners have been consolidated herewith: Robert G. O'Connor, docket No. 3484–78; Mary A. O'Connor, docket No. 3485–78; and W. G. Bush & Co. and Subsidiaries, John B. Herbert and Mary H. Herbert, James A. Skinner, Jr., and Beverly J. Skinner, docket No. 381–79.

1

*Vallie C. Brooks*, for the respondent.

GOFFE, *Judge*: The above docketed cases were consolidated for trial, briefs, and opinion because their issues for decision involve a common transaction. The Commissioner determined deficiencies in Federal income tax together with additions to such tax as follows:

| Docket No. | TYE Dec. 31— | Deficiency | Additions to tax | |
|---|---|---|---|---|
| | | | Sec. 6651(a)(1)[2] | Sec. 6653 |
| 3483–78 | 1971 | $8,336.67 | $2069.55 | 0 |
| | 1972 | 11,927.07 | 0 | 0 |
| | 1973 | 18,848.68 | 0 | $942.43 |
| 3484–78 | 1974 | 18,729.74 | 0 | 936.49 |
| 3485–78 | 1974 | 3,101.00 | 0 | 0 |
| 381–79[1] | 1971 | 17,103.00 | 0 | 0 |
| | 1973 | 15,925.66 | 0 | 0 |
| | 1975 | 694.00 | 0 | 0 |

[1] These are the deficiency amounts regarding Herbert Materials, Inc. All issues concerning the tax liabilities for petitioners John B. Herbert, Mary H. Herbert, James A. Skinner, Jr., and Beverly J. Skinner have been settled.

There are two issues for decision: (1) Whether certain payments made by petitioner Herbert Materials, Inc. (Bush)[3] to petitioners O'Connor, pursuant to an agreement under which Bush mined clay deposits on land owned by the O'Connors, represent payments from the sale of a capital asset or ordinary income, and (2) whether petitioner Bush is entitled to depletion on clay mined from the property.

The remaining elements of the proposed deficiencies have been settled by the parties.

The additions to tax are also not before this Court. The petitioners O'Connor have conceded all the proposed adjustments made by the Commissioner except those relating to the strip-mining transaction. Respondent has not made any specific concessions. The parties in the docketed cases involving the additions to tax, however, have stipulated that the only issue for decision concerns the tax implications of the strip-mining

[2] All section references are to the Internal Revenue Code of 1954 as amended.

[3] The name of W. G. Bush & Co. was changed to Herbert Materials, Inc., in 1979. We will refer to it herein as Bush.

agreement. The additions to tax have not been raised by any of the parties in their trial memoranda, nor were they raised at trial or on brief. No evidence was offered to demonstrate why the additions to tax should not be applied. We, therefore, find that the additions to tax have been conceded by petitioners.

### FINDINGS OF FACT

Some of the facts were stipulated. The stipulations of facts and attached exhibits are incorporated herein by this reference.

On the date the petitions in docket Nos. 3483–78, 3484–78, and 3485–78 were filed, the petitioners O'Connor resided in Nashville, Tenn. Docket No. 3483–78 concerns the income tax liability of petitioners Robert and Mary O'Connor for the taxable years 1971, 1972, and 1973. During each of the taxable years 1971, 1972, and 1973, the petitioners O'Connor were husband and wife. They filed a joint Federal income tax return for each of these years using the cash receipts and disbursements method of accounting with the Director, Internal Revenue Service Center at Memphis, Tenn. The petitioners O'Connor are now divorced. Both Robert and Mary O'Connor filed individual Federal income tax returns for the taxable year 1974 with the Director, Internal Revenue Service Center at Memphis, Tenn. Docket No. 3484–78 concerns Robert O'Connor's income tax liability for the taxable year 1974, and docket No. 3485–78 concerns Mary O'Connor's income tax liability for the taxable year 1974.

Petitioner Herbert Materials, Inc., formerly W. G. Bush & Co., is a corporation organized under the laws of the State of Tennessee which had its principal office and place of business in Nashville, Tenn., on the date the petition herein was filed. Bush filed a consolidated corporate Federal income tax return for the taxable years 1971 through 1975 with the Director of the Internal Revenue Service Center at Memphis, Tenn., using the accrual method of accounting.

No issues for decision remain concerning petitioners John B. Herbert, Mary H. Herbert, James A. Skinner, Jr., and Beverly J. Skinner, due to concessions made by the parties.

Bush has been engaged since 1867 in the business of manufacturing and selling masonry-related construction products, consisting primarily of clay bricks, and was so engaged

during the years at issue. In the manufacture of brick, the producer tries to arrange for an adequate supply of clay within a reasonable distance of its plant in order to avoid excessive costs for transporting the clay. Bush considers it desirable to stockpile at least a year's supply of clay for use in the manufacture of brick. When its own clay deposits began to run out in 1966, Bush considered obtaining new sources of clay. This could be done by purchase of the clay under a material contract, or by mining the clay from land which it either owned or leased. A long-term lease of the mineral rights to land with quantities of clay offers a brick manufacturer the advantages of assured supply without a large up-front capital investment.

In 1964, the petitioners O'Connor purchased a 300-acre farm which was located about 11 miles from downtown Nashville, fronting on the Cumberland River. The property was purchased in the joint names of Mr. and Mrs. O'Connor and was owned jointly by them until their divorce. Mr. O'Connor (hereafter all references to petitioner O'Connor in the singular will refer to Mr. O'Connor) learned that his farmland contained blue plastic clay that might be suitable for the manufacture of bricks. He contacted a representative of Bush from whom he had previously purchased bricks. Bush had Mr. Richard Warden, at that time a plant engineer, survey the O'Connor property. The property was divided into cross sections, core samples of the clay were taken in each section, and a detailed mining plan was prepared.

Petitioners O'Connor and petitioner Bush entered into an agreement on July 8, 1966. The agreement states that the O'Connors "lease to Bush for the purpose of mining clay" the described real property, which constitutes a portion of the O'Connors' property known as tract A. The lease is for a term of 7 years commencing on July 1, 1967, and expiring June 30, 1974. Bush is given the option to renew and extend the agreement for up to 3 additional years. Bush agrees to pay the O'Connors $40,000 but is not required to pay O'Connor for the first 160,000 cubic yards of clay mined. The O'Connors are entitled to keep the $40,000 even if no clay is ever mined by Bush. After 160,000 cubic yards of clay are mined from the premises, the O'Connors are entitled to $0.25 per cubic yard for additional clay mined, with the payments to be made

monthly for clay mined and delivered. Bush agrees to make reasonable efforts to mine clay from tract A and obtain at least 80 percent of its requirements therefrom. The agreement provides that Bush shall at all times manage the property and have full and exclusive control of the mining operations thereon. Bush is required to make all improvements necessary for mining the clay, including construction of dikes, access roads, and drainage ditches. The O'Connors remain liable for all real property taxes. The lease is subject to forfeiture at the option of the O'Connors if the property is acquired or condemned by eminent domain, if Bush is in violation of the agreement, or if Bush becomes bankrupt or insolvent.

Petitioner Robert O'Connor and petitioner Bush also executed a hauling agreement on July 8, 1966, whereby O'Connor would load and transport the clay to Bush's brickyard.

On April 29, 1968, Mr. and Mrs. O'Connor and Bush executed an agreement which modified the lease agreement to increase the advance payment to $67,000 but provided that Bush would not have to begin making additional payments for the clay mined and delivered until after delivery of the first 268,000 cubic yards (instead of 160,000 cubic yards). The agreement notes that the hauling agreement has been assigned from Mr. O'Connor, individually, to a partnership consisting of Mr. O'Connor and his brother. The agreement modifies the rate charged under the hauling agreement. The agreement provides that a corporation of Mr. O'Connor's will mine the property under the direction of Bush. The agreement also provides that upon a failure of performance under the mining and hauling agreements or a termination of those agreements, Bush's lease rights to mine the clay and enter upon the land for that purpose would continue. This agreement was subsequently modified a number of times but these changes affect the mining and hauling portions of the agreement and not the lease portion of the agreement.

The parties also entered into a series of agreements concerning another portion of the O'Connors' land, known as tract B. This agreement is embodied in a series of six agreements, the first of which was signed on January 19, 1973. The issue before us, however, does not concern these agreements, as no payments were made under these agreements during the taxable years in question.

Bush did pay the O'Connors the $67,000 required under the agreements concerning tract A. Bush at its own expense built an access road across the property, cleared the overburden, installed the necessary culverts, and accomplished all other work necessary to prepare the property for mining. Bush also applied and paid for mining permits and filed reclamation plans and bonds with the State of Tennessee. Bush subsequently made monthly royalty payments to the O'Connors on the basis of clay mined and delivered. During the years in question, the O'Connors reported receipts with respect to these clay deposits in the amount of $28,761 in 1971, $31,619.70 in 1972, $34,558.70 in 1973, and $41,186.29 in 1974.

On their Federal income tax returns for the years at issue, the petitioners O'Connor reported the income they received from Bush as long-term capital gain. The Commissioner has determined that they should have reported the income as ordinary income. Petitioner Bush claimed percentage depletion on the O'Connor clay deposits. The Commissioner has determined that petitioner Bush is not entitled to percentage depletion on the O'Connor clay deposits because Bush did not acquire an economic interest therein. The parties have stipulated that if petitioner Bush is entitled to a deduction for percentage depletion on the O'Connor clay deposits, "the amounts of such deduction allowable pursuant to such determination are the amounts disallowed in the notice of deficiency."

## OPINION

The first issue concerns the characterization of payments received by the O'Connors from Bush pursuant to the portion of the clay mining agreement which the parties denominated a "lease." Petitioners O'Connor maintain that the agreement under which the mining took place constituted a sale of minerals in place, rather than a lease for extracting minerals, so that the payments they received were for a sale of a capital asset. Respondent argues that the O'Connors retained an economic interest in the clay in place so that the payments received were royalties which, when reduced by the appropriate depletion allowance, are taxable to them as ordinary income.

The second issue results from the Commissioner's disallow-

ance of percentage depletion which Bush has claimed on the clay which it mined from the O'Connor property. While this issue may at first appear somewhat unrelated to the first issue, both because a different taxpayer is involved and because it relates to a different tax event, in truth, the resolution of both issues must be grounded in a clear understanding of a single concept that is unique to the income taxation of natural resources: the concept of economic interest.

The concept of economic interest was born in the context of "discovery" depletion of oil and gas. An understanding of why this concept is important for both our issues is aided by a quick look at this context. The Supreme Court in *United States v. Swank*, 451 U.S. 571 (1981), recognized that the congressional grace of percentage depletion of natural resources, which evolved from discovery depletion, implements the congressional intent to encourage the business of exploring, extracting, and producing natural resources. We intend, herein, to explain how the concept of risk played a significant role in the development of these principles and now aids our understanding thereof. Although much of this law developed with a primary focus on oil and gas, it is settled that these principles also apply to "hard mineral" cases such as the one before us. *Ridley v. Commissioner*, 58 T.C. 439 (1972).

The first income tax act enacted after ratification of the 16th Amendment, the Act of October 3, 1913, recognized that in order to arrive at a true reflection of a taxpayer's income, the tax laws needed to provide for the recovery of capital. In the context of mining, this meant that a reasonable allowance for the exhaustion of wasting resources must be allowed.[4]

The Revenue Act of 1918 developed this concept in two important ways. First, Congress created "discovery depletion," which meant that the amount the investor could deduct for depletion might be based not on cost, but rather on the fair market value of the minerals at the time of discovery, in effect providing for a step-up basis on the date of discovery: [5]

---

[4]Sec. II B, Revenue Act of 1913, ch. 16, 38 Stat. 114.
[5]Sec. 214(a)(10), Revenue Act of 1918, ch. 18, 40 Stat. 1057, 1066–1068.

## DEDUCTIONS ALLOWED.

Sec. 214(a) That in computing net income there shall be allowed as deductions:

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(10) In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion * * * based upon cost * * * *Provided further*, That in the case of mines, oil and gas wells, discovered by the taxpayer, * * * and not acquired as the result of purchase of a proven tract or lease, where the fair market value of the property is materially disproportionate to the cost, the depletion allowance shall be based upon the fair market value of the property at the date of the discovery, or within thirty days thereafter * * *

The purpose of discovery depletion was "to encourage the wildcatter or pioneer,"[6] that is, to encourage those willing to bear the risks necessary to discover and develop natural resources.[7] This was part of an overall policy of Congress to "stimulate prospecting and exploration."[8] Second, Congress provided that in "the case of leases the deductions allowed by this paragraph shall be equitably apportioned between the lessor and lessee." Sec. 214(a)(10), Revenue Act of 1918, ch. 18, 40 Stat. 1057. This provision was added to correct the "inequality"[9] of then-existing law as applied to the very popular lease form of developing natural resources wherein, in substance, the owner of the minerals transfers an interest in

---

[6]H. Rept. 1, 69th Cong., 1st Sess. (1925), 1939–1 C.B. (Part 2) 315; S. Rept. 52, 69th Cong., 1st Sess. (1926), 1939–1 C.B. (Part 2) 332.

[7]H. Rept. 767, 65th Cong., 2d Sess. (1918), 1939–1 C.B. (Part 2) 86, 93, expresses congressional policy on development:

"The depletion provision of existing law does not grant an allowance for cost of development. In the case of mines, oil and gas wells such an allowance seems only equitable and fair and the bill provides that a reasonable allowance in such cases be allowed for depreciation of improvements. * * * "

[8]S. Rept. 617, 65th Cong., 3d Sess. (1918), 1931–1 C.B. (Part 2) 117, 120–121; the Revenue Act of 1918 also gave the sale of mines and oil and gas wells treatment similar to the current tax treatment of long-term capital gain:

"The prospector for mines or oil and gas frequently expends many years and much money in fruitless search. When he does locate a productive property and comes to settle it seems unwise and unfair that his profit be taxed at the maximum rate as if it were ordinary income attributable to the normal activities of a single year. To stimulate prospecting and exploration, the committee has limited the surtax to 20 per cent of the selling price in the case of a bona fide sale of mines, oil or gas wells where the principal value was demonstrated by prospecting, exploring, or discovery work done by the taxpayer (section 211b). * * * Special provision is also made for increased depletion allowance in the case of such properties (section 214(10) and section 234(9)) [discovery depletion]."

[9]H. Rept. 767, 65th Cong., 2d Sess. (1918), 1939–1 C.B. (Part 2) 86.

the minerals to the developer yet also retains an interest in the same minerals.

Both lessors and lessees may be entitled to depletion. This does not mean that the same income is used to compute two depletion deductions. Each is entitled to depletion only as to his economic interest therein. Accordingly, if a lessor leases mineral rights while retaining an interest therein, the depletion is allowable on the royalty income he receives from the lessee, and the lessee is entitled to depletion on the net of the gross receipts from production less the royalties he has paid to the lessor.

Percentage depletion was created by Congress in the Revenue Act of 1926. Sec. 204(c)(2), Revenue Act of 1926, ch. 27, 44 Stat. (Part 2) 9. The Conference Report, H. Rept. 356, 69th Cong., 1st Sess. (1926), 1939–1 C.B. (Part 2) 362–363, explains that:

> The administration of the discovery provision of existing law in the case of oil and gas wells has been very difficult because of the discovery valuation that had to be made in the case of each discovered well. In the interest of simplicity and certainty in administration the Senate amendment provides that in the case of oil and gas wells the allowance for depletion shall be 30 per cent of the gross income from the property during the taxable year. * * *
>
> The House recedes with an amendment providing that the depletion deduction based upon gross income in the case of an oil and gas well shall be 27½ per cent of that income instead of 30 per cent * * *

At first, percentage depletion applied only to oil and gas production, as indicated above. Its application as a substitute for discovery depletion was gradually extended to more and more minerals, with brick and tile clay allowed percentage depletion in the Revenue Act of 1951.[10] The phaseout of discovery depletion in favor of percentage depletion was completed by the Internal Revenue Code of 1954.[11] Percentage depletion, then, is the administratively practical principle

---

[10]Sec. 319(a), Revenue Act of 1951, ch. 521, 65 Stat. 452.
[11]H. Rept. 1337, 83d Cong., 2d Sess. (1954).

used by Congress to achieve the public policy of encouraging the risks inherent in the discovery of natural resources.[12]

The concept of economic interest was defined by the Supreme Court in *Palmer v. Bender*, 287 U.S. 551 (1933), when the Court was asked to decide who was entitled to the allowance for discovery depletion after a sublease. In that case, the taxpayer invested in two oil and gas partnerships, each of which acquired Louisiana oil and gas leases on unproven land and subsequently drilled for and discovered oil. Each of these partnerships then transfered a portion of its lease to a third party, receiving in exchange certain bonus payments and retaining a one-eighth royalty. When the taxpayer reported a deduction for discovery depletion, the Commissioner disallowed the deduction arguing that the leases were sold, based on a State law characterization that they were assigned. In allowing the taxpayer his depletion, the Supreme Court observed that:

> The language of the statute is broad enough to provide, at least, for every case in which the taxpayer has acquired, by investment, any interest in the oil in place, and secures, by any form of legal relationship, income derived from the extraction of the oil, to which he must look for a return of his capital. [287 U.S. at 557.]

The Court made it clear that any State law characterization is not controlling for Federal income tax purposes and that the taxpayer's:

> right to a depletion allowance does not depend upon his retention of ownership or any other particular form of legal interest in the mineral content of the land. It is enough if by virtue of the leasing transaction, he has retained a right to share in the oil produced. If so, he has an economic interest in the oil, in place, which is depleted by production. * * * [287 U.S. at 557.]

The Court went on to explain that regardless of the form of relationship to the property, the investment of the taxpayer was at risk. "The loss or destruction of the oil at any time * * * would have resulted in loss [to the taxpayer]." A contrary result would have defeated, according to the Court, the clear public policy of "favoring the discovery of oil." This

---

[12]The allowance of oil and gas depletion in excess of cost is once again contingent upon discovery as a result of the transfer rules of sec. 613A(c)(9) added by sec. 501(a) of the Tax Reduction Act of 1975, Pub. L. 94–12, 89 Stat. 26.

definition is interpreted to mean that "the taxpayer must look *solely* to the extraction of oil or gas for a return of his capital." *Commissioner v. Southwest Exploration Co.*, 350 U.S. 308, 314 (1956). Emphasis in original.

The Commissioner has adopted this definition of economic interest in section 1.611–1(b)(1), Income Tax Regs.—

An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the extraction of the mineral or severance of the timber, to which he must look for a return of his capital.

Economic interest, percentage depletion, and risk, then, are inextricably related. Risk exists when one must look solely to extraction of a mineral resource in order to recover an investment, and is a prerequisite to the existence of an economic interest and thus to the allowance of percentage depletion.

We will now consider the first issue. Whether the O'Connors sold the clay and are entitled to capital gain treatment on such sale[13] or whether they instead must report their receipts as ordinary income reduced by depletion depends on whether they have retained an economic interest therein. *Ridley v. Commissioner*, 58 T.C. 439 (1972).

The O'Connors and Bush entered into an agreement in 1966 which provided for a "lease" of the O'Connors' land for the purpose of mining clay. By the time of the taxable years before us, this "lease" was contained in a document covering the legal relationship of the parties not only as to the right of extraction but also regarding the hauling and mining of the clay. The parties also had a similar agreement regarding another portion of the O'Connors' land. The issue before us, however, concerns only the part of the agreement concerning the "lease" of the original portion of their land (hereinafter all references to "the land" shall refer to the property subject to the first agreement, also known as tract A).

A first glance at the agreement appears to reveal a lease and not a sale. The agreement provides that the O'Connors "lease

---

[13]The parties appear to agree that the other requirements of capital gain treatment are met.

to Bush for the purpose of mining clay" the land in question. The lease is for a term of 7 years with an option on 3 more years. The agreement provides the O'Connors a royalty of $0.25 per cubic yard with what appears to be an advance royalty of $67,000 to be recouped by Bush out of the regular royalty so that the regular royalty payments begin only after the first 268,000 cubic yards of clay have been produced and delivered.

The petitioners O'Connor paint this portrait differently. They maintain that the agreement contemplated that a definite amount of clay would be mined, this expectation was met, and, thus, the minerals were sold for a fixed total consideration. To support this, they point to the portion of the agreement wherein Bush agrees to mine clay from the land to obtain 80 percent of its clay requirements for its Nashville plant. The O'Connors suggest that Bush was unconditionally obligated to remove the contemplated quantity of clay from their land.

In order to find that the O'Connors sold their interest in the clay deposits, we must find that they did not retain an economic interest therein. *Ridley v. Commissioner, supra;* *Gitzinger v. United States,* 404 F.2d 191 (6th Cir. 1968). This determination requires that we carefully review the facts to discern whether the O'Connors retained an interest (1) in minerals in place which they acquired by investment, and (2) regarding which they must look solely to the extraction of the minerals for a return of their capital. *Palmer v. Bender,* 287 U.S. 551 (1933); *Commissioner v. Southwest Exploration Co., supra.* There is no dispute that the O'Connors acquired by investment their interest in the clay deposits. They maintain, however, that they completely divested themselves of their economic interest through the "lease" agreement. We must look to the facts to determine whether they continued to participate in the risk of production and therefore retained an economic interest.

The O'Connors suggest that this issue should be decided by a line of cases in which taxpayers were found to have sold their interest in quantities of minerals. In *Rhodes v. United States,* 464 F.2d 1307 (5th Cir. 1972), the Fifth Circuit found that a sale was made when the contract purported to:

"grant, bargain, sell, assign, convey, transfer and set over unto" Excelsior, as

grantee, "in fee simple", all of the "merchantable brick clay" deposits underlying a specifically designated and described one acre parcel of the Stay tract, the purchase price being $7500.00. [464 F.2d at 1309].

The Fifth Circuit again found a sale in *Whitehead v. United States*, 555 F.2d 1290 (5th Cir. 1977), where the taxpayer transferred a fixed quantity of sand and gravel in place, namely 1,333,333½ cubic yards, for a total fixed price of $200,000. In *Day v. Commissioner*, 54 T.C. 1417 (1970), we found that the petitioner made a sale when he transferred "the right to *all* of the water underlying petitioner's lands" (54 T.C. at 1423, emphasis in original). In that case, we specifically held that the petitioner did not retain an economic interest therein. The petitioners O'Connor also bring *Linehan v. Commissioner*, 297 F.2d 276 (1st Cir. 1961), revg. 35 T.C. 533 (1960), to our attention. This case, however, appears anomalous in that it considers the issue to be the existence of an economic interest in severed minerals as opposed to minerals in place. We rejected the *Linehan* approach in *Lesher v. Commissioner*, 73 T.C. 340 (1979), affd. 638 F.2d 64 (8th Cir. 1981), thereby joining criticism of *Linehan* previously expressed by both the Third and the Fifth Circuits.[14]

The foregoing indicates that it is certainly possible for a taxpayer to transfer his entire interest in all of, or a portion of, minerals in which he possesses an economic interest. The question before us is whether the O'Connors have done so.

The key to the O'Connor position is their premise that the agreement unconditionally required Bush to extract and remove a certain quantity of clay. The original agreement provides as follows (subsequent revisions of the agreement restate this clause in substantially similar form):

1. Until the deposits of commercially usable clay on the demised premises which can be feasibly mined have been exhausted, Bush agrees to make every reasonable effort, consistent with its business operations, to mine same during the original term or any renewal hereof. In this connection, Bush further agrees that so long as commercially usable clay for the manufacturing of brick which can be feasibly mined is available from deposits located on the demised premises, at least eighty (80) per cent of the clay utilized in the production of clay bricks at its plants located in Davidson County, Tennessee, during the term hereof shall be from that supply mined

---

[14]*Laudenslager v. Commissioner*, 305 F.2d 686 (3d Cir. 1962), affg. a Memorandum Opinion of this Court; *Wood v. United States*, 377 F.2d 300 (5th Cir. 1967).

on and from the demised premises. It is contemplated that the total yield of clay mined or to be mined will approximate the estimate set out in a survey compiled previously by Bush and labeled "Report on O'Connor Clay Land, January, 1966," which report by reference is made a part hereof, but the parties hereto understand that said estimate is subject to such adjustments (increase or decrease) as necessary to reflect correctly the commercially usable clay deposits actually existing on the demised premises which can be feasibly mined.

We do not view this provision as an unconditional requirement on Bush to extract and remove any certain amount of clay or all the clay on a certain defined property. Bush's obligation is conditioned on (1) the O'Connor clay's meeting Bush's specifications, (2) the "feasibility" of mining the clay, which might include any number of economic and regulatory exigencies, and (3) the requirements of Bush's Davidson County plants, which might vary greatly as Bush is dependent on the vagaries of the construction industry for which it provides building materials. The clause puts the O'Connors in no better position than that of a preferred supplier for a portion of Bush's requirements. We also observe that the presence of an advance royalty, a royalty paid up front but recoupable out of production, is designed to protect the O'Connors in case Bush does *not* remove significant amounts of clay, and thereby emphasizes their recognition of the inherent contingencies.

In the case of *Laudenslager v. Commissioner*, 305 F.2d 686 (3d Cir. 1962), affg. a Memorandum Opinion of this Court, a road building contractor agreed to pay the taxpayers $0.05 per cubic yard for all fill dirt removed from their property. The contract specified that the fill was to be used in building a particular highway and that a minimum of 400,000 cubic yards would be removed, but that quantities could be adjusted based on requirements. The court found that a requirements contract such as this, even with a specified minimum amount tied to those requirements, did not constitute an unconditional purchase of a specified quantity of mineral. The court noted that the obligation to mine was contingent, as here, both upon the material's mined meeting certain specifications and upon the needs of the construction project in which the fill dirt was to be used. The court held that the taxpayers retained an economic interest in the minerals in place.

The O'Connor agreement is also similar to the agreement in

*Lesher v. Commissioner, supra.* In that case, unlike the one before us, the agreement purported to constitute a sale of the taxpayers' minerals. This Court, instead, found that the agreement represented a requirements contract under which the taxpayers were entitled to a per-ton royalty based on extraction. We held that the taxpayers retained an economic interest in the minerals in place so that they were required to report their receipts under the agreement as ordinary income. Accord, *Dingman v. United States*, 429 F.2d 70 (8th Cir. 1970).

We have found that the "requirements" clause did not cause the agreement to effect a sale. Why then would a lease agreement include such a clause? Although the petitioners O'Connor may argue that this is a failed attempt at creating a sale, it may indeed be that no such attempt was intended. To understand this, we should look to the nature of the contractual relationship created under a lease of natural resources. Under a lease agreement, the lessor grants the lessee the exclusive right to mine certain natural resources. Although there might be some cash consideration for this privilege, the "true consideration for the transaction was the expectation of development of the premises and the payment of royalties to be derived" therefrom. 5 E. Kuntz, Oil and Gas 47 (1978). Accordingly, many jurisdictions, including Tennessee, have developed an implied duty on the part of the lessee to mine the premises for minerals. *Tennessee Valley Kaolin Corp. v. Perry*, 526 S.W.2d 488 (Tenn. Ct. App. 1974); 5 American Law of Mining 330 (1968). The general remedy for failure to fulfill this duty is cancellation of the lease. 5 American Law of Mining 339 (1968). This permits the lessor to find someone else willing to develop his minerals. The implied duty to reasonably develop may not exist in Tennessee, however, where significant consideration for the lease agreement is otherwise present, such as when the lease agreement provides for minimum payments in lieu of production. *Tennessee Valley Kaolin Corp. v. Perry, supra.* It is quite understandable, then, that Tennessee lessors would want an express duty of reasonable development included in the lease agreement. The assurance which this duty creates is yet stronger in the instant case because the duty of reasonable development is tied to the anticipated requirements of the lessee. It does not, however, suggest that a sale of the mineral rights has been consummat-

ed, nor does it require the lessee to mine any certain quantity of minerals. *Weatherly v. American Agricultural Chemical Co.*, 65 S.W.2d. 592 (Tenn. Ct. App. 1933). We do not mean herein to suggest that State law controls the issue before us, nor that the criterion for decision is a comparison of sale versus lease. This does, however, shed light on the purpose of the clause in the agreement.

Neither does the advance royalty indicate that the O'Connors did not retain an economic interest. The Sixth Circuit, to which appeal herein lies, considered the effect of an advance or minimum royalty in *Gitzinger v. United States*, 404 F.2d 191, 194–195 (6th Cir. 1968).

appellees were to receive a "minimum annual royalty" of $10,000 regardless of the quantity of limestone removed. That paragraph also specifies that any payments made by Atlas under this provision which exceeded the amount due for limestone actually removed would be credited against amounts owed in excess of the minimum annual royalty in subsequent years. It is evident that this provision does not negate the retention of an economic interest. Wood v. United States, [377 F.2d 300 (5th Cir. 1967)]; Schreiber v. United States, [382 F.2d 553 (7th Cir. 1967)]; Freund v. United States, [367 F.2d 776 (7th Cir. 1966)]; Laudenslager v. Commissioner, [305 F.2d 686 (3d Cir. 1962)]. See Bankers Pocahontas Coal Co. v. Burnet, [287 U.S. 308 (1932)]. In *Wood* the Court stated, with regard to a minimum royalty provision similar to that in the instant case:

"Under the economic interest test, the critical consideration is whether payment is dependent upon extraction * * *

"[T]he courts have stated many times that a minimum royalty, such as that present in this case, is merely an advancement for future payments in the form of a guarantee and does not render payment dependent on a factor other than extraction or production. 377 F.2d at 306, 307."

Under this rationale the $20,000 "*advance on minimum annual royalties*" provided for in Paragraph 2(b) of the agreement *is also consistent with appellees' retention of an economic interest in the limestone since, according to the terms of that paragraph, subsequent annual royalty payments were to be charged against this advance until it was offset.* [Emphasis added; fn. refs. omitted.]

The O'Connor lease similarly provides that the advance royalty will be offset against or recouped out of the royalty on future production.

The petitioners O'Connor suggest that *Commissioner v. Remer*, 260 F.2d 337 (8th Cir. 1958), should control, but their reliance thereon is unfounded. In that case, the taxpayer purported to sell stockpile ore-mining leases for a large initial consideration together with additional payments on produc-

tion. The Eighth Circuit looked to the form of the transaction and found that the intent of the parties to consummate a sale was supported by the presence of large initial payments.[15] The court went on to find that the taxpayer did not retain an economic interest in the property sold.

On review of the record before us and the settled authority, we hold that the O'Connors did retain an economic interest in minerals in place. It is clear that they continued to share in the risks of production and thus were required to look solely to production to recover their capital. Accordingly, we hold for respondent on this issue.

The second issue concerns whether Bush is entitled to depletion on clay mined from the property. In his statutory notice the Commissioner disallowed Bush's claimed depletion on the O'Connor clay deposits "because it has not been established that you had an economic interest in these clay deposits during these years." At trial, respondent was permitted to amend his pleading to introduce as new matter the alternative theory that Bush has already had the benefit of cost depletion on the O'Connor clay deposits by including the amounts paid for such clay in its cost of goods sold.[16] Respondent retreats from this position in his reply brief. Respondent now advances the argument that Bush has already had the benefit of cost depletion only in the circumstance that we hold for the petitioners O'Connor on the first issue. If, as has come to pass, we hold that the petitioners O'Connor retained an economic interest in the clay deposits, respondent abandons his alternative theory and relies solely on his original position that Bush did not acquire an economic interest in the O'Connor clay. The respondent concedes that

---

[15]It appears that this case was decided during the years in which the courts struggled to determine the proper test for hard minerals, and is an example of according undue weight to the form of the transaction as one might if the criterion for decision were sale versus lease. P. Maxfield & J. Houghton, Taxation of Mining Operations, sec. 8.03[1][a] (1981). The opinion specifically declines to determine whether or not the test is the retention of an economic interest. *Commissioner v. Remer*, 260 F.2d 337, 339 (8th Cir. 1958). The Eighth Circuit now recognizes the economic interest test. *Rabiner v. Bacon*, 373 F.2d 537 (8th Cir. 1967); *Dingman v. United States*, 429 F.2d 70 (8th Cir. 1970). In *Dingman*, the Eighth Circuit found that a requirements clause did not create a sale.

[16]Although the statutory notice and this amendment to the pleadings refer not only to the O'Connor clay deposits but also to Gleason clay deposits, petitioner Bush's reply to amendment to answer concedes the issue as to the Gleason clay deposits.

Bush is entitled to percentage depletion if we find that although the O'Connors retained an economic interest in the clay deposits, Bush also acquired such an economic interest. The obvious inconsistency in respondent's position appears to be the result of his perception that Bush's argument on brief does not contemplate the result that should obtain if we hold for the O'Connors on the first issue. Although the issue is not before us, we observe that respondent's confusion appears to result from not recognizing that royalty payments are excluded from the income of a lessee because they are income from an economic interest not possessed by the lessee. The lessee's depletion is based on the economic interest which it does possess. The above should not be affected by whether Bush acquired its economic interest by lease or purchase.

Whether Bush is entitled to the claimed percentage depletion, then, turns squarely on whether it acquired an economic interest in minerals in place. Respondent suggests that Bush has not acquired an economic interest in the clay deposits because Bush did not make an investment therein, presumably suggesting that the advance royalty was not an investment in the lease as it may be recouped from production. This theory was fully developed by the respondent and rejected by this Court in *Weaver v. Commissioner*, 72 T.C. 594 (1979).

The real issue, then, is whether petitioner "acquired by investment an interest in minerals in place," thereby satisfying the first prong of *Palmer v. Bender*. If these words were read without reference to the substantial body of case law which has staked out their boundaries, it might well be contended that petitioner has made no such investment. In the case of the Munroe agreement, for example, petitioner literally made no direct "investment" at the time he initially acquired his rights as lessee to the minerals. He had no express obligation to do any mining at all, and agreed to pay Munroe only if, as, and when he did extract minerals on his property. It is true that he incurred substantial development expenses, as detailed above, but these expenses gave him no greater *ownership* rights *in mineral in place*; they merely enlarged his economic stake in exercising his rights to mine under the lease. It would appear on the basis of a surface reading, therefore, that such an investment fell short of acquisition by investment of an interest in minerals in place. Despite this literal reading, the case law, discussed below, convinces us that the acquisition by a mine operator of a substantial bona fide ownership or leasehold interest in the minerals in place, or the economic equivalent thereof, will satisfy the first prong test, whether or not an "investment" is made to *acquire* such interest, at least as long as a significant related investment is made in development of the property to facilitate exploitation of such ownership or leasehold rights. Thus, it has

frequently been held to suffice that a capital interest is acquired, even if not literally acquired by *investment*. We conclude that the *investment* need not literally be an investment in the minerals in place; it suffices if the investment is a practical prerequisite to successful exploitation of rights to mine the mineral in place, so long as the taxpayer in fact acquires and owns a true capital interest in the mineral in place. [Emphasis in original; 72 T.C. at 601, 602.]

We find that Bush has made a significant development investment. Bush built an access road across the property, cleared the overburden, installed the necessary culverts, and accomplished all other work necessary to prepare the property for mining, including acquiring the necessary State of Tennessee mining permits.

Respondent also argues that "Bush did not have an economic interest because it was only purchasing clay from the O'Connors." This contention ignores the facts. Bush had the exclusive right to mine the clay in the ground at a fixed royalty per cubic yard. We do not view the mining and hauling agreements with one of the lessors, Mr. O'Connor, to affect this. Bush's lease rights to mine the clay and enter upon the land for that purpose were not in any way contingent on these other agreements.

The record before us clearly shows that Bush acquired an economic investment in the O'Connor clay deposits. Bush has by lease acquired the right to mine the clay deposits. Bush clearly bears the risk of production. We hold for petitioner Bush on this issue.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*